RICHARD R. PATCH (State Bar No. 88049)
HOWARD A. SLAVITT (State Bar No. 172840)
FREDRICK C. CROMBIE (State Bar No. 244051)
BENJAMIN C. PULLIAM (State Bar No. 294628)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email: ef-rrp@cpdb.com
        ef-has@cpdb.com
        ef-fcc@cpdb.com
        ef-bcp@cpdb.com

Attorneys for Plaintiffs
SACRAMENTO DOWNTOWN ARENA LLC;
SACRAMENTO KINGS LIMITED
PARTNERSHIP; SAC MUB1 HOTEL, LLC;
and SGD RETAIL LLC

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| SACRAMENTO DOWNTOWN ARENA LLC; SACRAMENTO KINGS LIMITED PARTNERSHIP; SAC MUB1 HOTEL, LLC; and SGD RETAIL LLC, <br><br> Plaintiffs, <br><br> v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, and DOES 1-10, inclusive, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR DAMAGES:** <br><br> 1. **Declaratory Relief** <br> 2. **Breach Of Contract** <br> 3. **Breach Of The Implied Covenant Of Good Faith And Fair Dealing** <br><br> **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.    The COVID-19 pandemic has wreaked havoc on the lives of Americans of all walks of life.

2.    The pandemic has also caused widespread economic harm to countless people and businesses across the country.  Three sectors hit particularly hard by the pandemic are the live entertainment industry, the hospitality industry, and the retail industry.

1

**COMPLAINT FOR DAMAGES**

3.       In an effort to stop or minimize the spread of the virus, the State of California and local governments issued a series of far-reaching orders prohibiting large gatherings, modifying occupancy standards, and in some cases and at some times, ordering businesses to close and residents to stay home.

4.       For the live entertainment industry, these orders resulted in a complete interruption and cessation of business.  Unable to host sporting events, concerts, and other live entertainment events, venues and their operators (like Plaintiffs Sacramento Downtown Arena LLC and Sacramento Kings Limited Partnership) have lost huge sums as they heeded governmental orders meant to protect the public from the pandemic.

5.       Likewise, the hospitality and retail industries in California (like Plaintiffs SAC MUB1 Hotel LLC and SGD Retail LLC) have been decimated during the COVID-19 pandemic because residents have been ordered to stay home and access to hotels and stores has been severely restricted or shut down.  Plaintiffs Sacramento Downtown Arena LLC, Sacramento Kings Limited Partnership, SAC MUB1 Hotel LLC and SGD Retail LLC are collectively referred to as "Plaintiffs."

6.       This action arises from Defendant Factory Mutual Insurance Company's ("Factory Mutual" or "Defendant") refusal to pay Plaintiffs' claim under the insurance policy that Plaintiff Sacramento Downtown Arena purchased from Factory Mutual.  Plaintiffs have been gravely harmed by numerous governmental orders issued directly in response to physical damage caused by the COVID-19 pandemic.

7.       Like other live venue operators across the country, Plaintiffs Sacramento Downtown Arena LLC and Sacramento Kings Limited Partnership effectively lost an entire year of revenue.  Beginning on or about March 12, 2020, Plaintiffs were unable to host top-tier live events including Sacramento Kings games, NCAA tournament games, concerts by top musical acts such as Billie Eilish and Camila Cabello, a talk by former First Lady Michelle Obama, and other highly-anticipated events at the Golden 1 Center.

8.       As the owner of the Kimpton Sawyer Hotel, Plaintiff Sac MUB1 Hotel, LLC had its occupancy plummet and its gross earnings and gross profits from the hotel, and associated

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1   restaurants and bars vanish.  In late March 2020, the Kimpton Sawyer Hotel closed for roughly ten

2   weeks as travel was severely restricted within the state.  Occupancy since reopening has been

3   approximately 31% compared to occupancy of approximately 85% during the same period in the

4   prior year.

5          9.     As the owner of the Sacramento Downtown Commons retail spaces, Plaintiff SGD

6   Retail LLC suffered losses as its rents, including base rents and rents determined based upon a

7   predetermined percentage of the retail tenants' sales, and other retail-related revenues drastically

8   declined.

9          10.    Plaintiffs counted themselves fortunate that they had purchased high-level

10  insurance to protect themselves against catastrophes like the COVID-19 pandemic.  Plaintiffs

11  purchased an insurance policy (the "Policy") from Defendant that protected them—with only

12  limited and specific exclusions—against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE."

13  (Sometimes referred to herein as "All Risk Insurance" or any "All Risk Policy.")

14         11.    The Policy specifically provided coverage against losses caused by certain

15  "order[s] of civil or military authority limits, [that] restrict[] or prohibits partial or total access to

16  an insured location."  Further, the Policy covers losses for communicable diseases in the

17  "Communicable Disease Response" and "Interruption by Communicable Disease" provisions.

18         12.    Based on the plain language of the Policy, Plaintiffs reasonably believed they

19  would be covered for their losses stemming from an occurrence like COVID-19 and the associated

20  governmental orders.  They made a claim to Factory Mutual "in a reasonable manner."

21         13.    Factory Mutual, however, denied Plaintiffs' claim.  In doing so, Factory Mutual

22  failed to engage with the substance of Plaintiffs' claim or the language of the Policy.  Factory

23  Mutual also ignored the specific terms of the Policy, long accepted constructions of the operative

24  insurance policy terms, and the well-established doctrine under California law to, wherever

25  reasonably possible, construe ambiguities in standard form policy wording against the drafter.

26         14.    Plaintiffs seek to compel Factory Mutual to provide the insurance coverage benefits

27  it promised to provide when it sold the insurance policy.  Further, given Factory Mutual's

28  wrongful denial of coverage, its denial of Plaintiffs' claim without a reasonable investigation and

3

**COMPLAINT FOR DAMAGES**

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

1  its apparently intentional misconstruction of the express terms of the insurance Policy, Plaintiffs

2  seek punitive damages and all other damages deemed appropriate by the Court.

3  ## THE PARTIES

4     15.    Plaintiff Sacramento Downtown Arena LLC is a Delaware limited liability

5  company, with its principal place of business in Sacramento, California.  Sacramento Downtown

6  Arena LLC operates the Golden 1 Center in Sacramento, California, which is an insured location

7  under the Policy.  Sacramento Downtown Arena LLC operates and manages the non-NBA events

8  at Golden 1 Center.

9     16.    Plaintiff Sacramento Kings Limited Partnership (collectively with Sacramento

10  Downtown Arena LLC, "Arena Plaintiffs"), is a California entity, with its principal place of

11  business in Sacramento, California.  Sacramento Kings Limited Partnership operates and manages

12  all Sacramento Kings-related events at Golden 1 Center.

13     17.    Plaintiff Sac MUB1 Hotel, LLC ("Hotel") is a Delaware limited liability company,

14  with its principal place of business in Sacramento, California.  Plaintiff Hotel owns the Kimpton

15  Sawyer Hotel, which is an insured location under the Policy.

16     18.    Plaintiff SGD Retail LLC ("Retail") is a Delaware limited liability company, with

17  its principal place of business in Sacramento, California.  Plaintiff Retail owns retail spaces that

18  surround the Golden 1 Center and are commonly known as the Sacramento Downtown Commons,

19  and that are insured locations under the Policy.

20     19.    Defendant Factory Mutual Insurance Company ("Factory Mutual" or "Defendant")

21  is a corporation organized and existing under the laws of the State of Rhode Island, with its

22  principal place of business in Johnston, Rhode Island.  At all times relevant hereto, Factory

23  Mutual was licensed to do business, and was doing and transacting business, in the State of

24  California.

25     20.    Plaintiffs are ignorant of the true names and capacities of defendants sued herein as

26  DOES 1-10, inclusive, and therefore sue these defendants by said fictitious names.  Plaintiffs are

27  informed and believe, and thereon allege, that said fictitiously named defendants are responsible in

28  some manner for the events and happenings herein referred to, or that they are otherwise legally

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

responsible for the breaches and/or wrongs alleged herein, including but not limited to: as persons or entities that caused the complained of injuries and damages proximately to Plaintiffs that are alleged herein; as alter egos of Factory Mutual and/or of another DOE defendant that was responsible in some manner for the events and happenings referred to or that is otherwise legally responsible for the breaches and/or wrongs alleged herein; as persons or entities who have received or have substantial control over Factual Mutual's funds or assets; as aiders and abettors of Factory Mutual; and/or otherwise.  After each of DOES 1-10's true names or facts concerning their conduct or other basis for their legal responsibility are discovered, Plaintiffs will amend or seek leave to amend to substitute such persons or entities into the case by their true names in place of DOES 1-10.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), §1391(c)(2) and §1391(d) because Factory Mutual does business in California and is an authorized property and casualty insurer in California, and because a substantial part of the events or omissions giving rise to the claim occurred, and/or a substantial part of property that is the subject of the action is situated in, this District.

## FACTUAL BACKGROUND

I.     **Plaintiffs' Operations**

23.     Arena Plaintiffs operate the Golden 1 Center in Sacramento, California.

24.     The Golden 1 Center sits in the heart of downtown Sacramento and is home to the National Basketball Association's ("NBA") Sacramento Kings.

25.     Opened in September 2016, the Golden 1 Center revitalized Sacramento's sagging downtown area by bringing NBA basketball and world-class live events to the area.

26.     Plaintiff Hotel owns the Kimpton Sawyer Hotel adjacent to the Golden 1 Center in downtown Sacramento, California.  The Kimpton Sawyer is a 250 room boutique luxury hotel.

1   Since its opening in 2017, it has been recognized as one of the best hotels in Northern California.

2          27.     Plaintiff Retail owns the Sacramento Downtown Commons, a two-level outdoor

3   shopping and dining complex adjacent to the Golden 1 Center.  Its tenants include a 24-Hour

4   Fitness health club; a Century Theatres movie theater; a Punch Bowl Social (a restaurant and bar

5   with bowling lanes, and other entertainment); seventeen additional restaurants and fast-casual food

6   and beverage tenants; and six retail tenants.  In connection with the Golden 1 Center and the

7   Kimpton Sawyer Hotel, Downtown Commons has become a must-visit destination in downtown

8   Sacramento.

9   **II.**    **The Policy**

10          28.     To protect Plaintiffs' significant property and business income interest, in

11   September 2019, Plaintiff Sacramento Downtown Arena purchased an insurance policy from

12   Factory Mutual.

13          29.     The Factory Mutual Policy issued is policy no. 1058876 (the "Policy") and has an

14   effective date of September 16, 2019 to September 16, 2020.  (Attached as **Exhibit A**.)

15          30.     The Policy contains a "Location Schedule" that identifies the Golden 1 Center, the

16   Kimpton Sawyer Hotel, and the Sacramento Downtown Commons as insured locations under the

17   Policy.  Ex. A at 73.  The "All Risks" policy coverage and other insurance Policy additions,

18   extensions and other coverage in the Policy provide coverage for all covered risks at each of these

19   and other insured locations.

20          31.     The Policy broadly provides coverage "against ALL RISKS OF PHYSICAL LOSS

21   OR DAMAGE, except as hereinafter excluded."  *Id*. at 7.

22          32.     The Policy limits the maximum coverage under the policy to $850,000,000.00 per

23   occurrence.  *Id.* at 8.

24          33.     The Policy defines an "occurrence" to be, "the sum total of all loss or damage of

25   the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one

26   discrete event of physical loss or damage, . . ."[1]  *Id.* at 70.

27   _____

28   [1] Although there are two exceptions—for terrorism and earth movement—neither exception is relevant here.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

34.     The Policy explicitly provides coverage for communicable diseases.  The "Property" portion of the Policy provides coverage for "Communicable Disease Response," *id.* at 26, and the Time Element Coverage Extensions provide coverage for "Interruption by Communicable Disease," *id.* at 57.

35.     The Time Element portion of the Policy includes various Time Element Coverage Extensions.

36.     The Time Element Coverage Extensions portion of the Policy includes a provision titled "Civil or Military Authority."  *Id.* at 51.

37.     The Civil or Military Authority provision states:

> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five miles/eight kilometers of it.

38.     The Civil or Military Authority provision further states:

> The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be: The period of time: 1) starting at the time of such physical damage; and 2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section, this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

39.     Although the Policy states that coverage under the Civil or Military Authority Provision is limited to a period of 30 days for each occurrence, *id.* at 9, the Contingent Time Element Extended provision of the Policy extends the coverage available under this and other Time Element provisions, *id.* at 51.  Where, like here, the Contingent Time Element Extended provision applies, the Policy coverage limit under the Civil or Military Authority provision and other Time Element provisions is increased to no less than $25,000,000 per occurrence.  *Id.* at 9.

### III.     The COVID-19 Pandemic

40.     COVID-19 is a communicable disease caused by the coronavirus known as SARS-CoV-2 and its variants (collectively referred to herein as "COVID-19" or "the coronavirus").

One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

Coblentz Patch Duffy & Bass LLP

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

41.     The coronavirus can be transmitted in several ways, including via human-to human contact, airborne viral particles in ambient air, and touching surfaces or objects.  For example, when an uninfected person touches a surface containing the coronavirus, the uninfected person may then become the vector to transmit the coronavirus from that surface to another person.

42.     The Centers for Disease Control and Prevention ("CDC") has stated that the coronavirus is most likely to spread when people are within six feet of each other, but has acknowledged that the coronavirus may spread from an infected person who is more than six feet away or who has departed a given space.[2]

43.     According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days.  Some studies suggest that the period may be up to 21 days.  Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are highly contagious, as their viral loads will likely be very high, and they may not know they have become carriers.

44.     Physical droplets containing the coronavirus can land on objects and surfaces.  After landing on objects and surfaces, the coronavirus can remain present and dangerous for periods ranging from hours to many days.

45.     People can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth.  This mode of transmission—transmission via objects and surfaces—is known as "fomite transmission."

46.     The coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

47.     Coronavirus also spreads through the air.  For example, airborne viral particles are known to have spread into a facility's heating and ventilation ("HVAC") system, and then leading to transmission of the coronavirus from person to person.[3]

///

///

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covidspreads.html.
[3] *See* https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

48.     Since the start of the pandemic, over 94,000 people in Sacramento County have tested positive for COVID-19 and over 1,500 have died from the disease.[4]

**IV.     The State Of California And Sacramento County Issue Stay At Home Orders**

49.     In response to substantial evidence that COVID-19 was present in California, including in Sacramento, on March 11, 2020, Governor Gavin Newsom issued guidance that "gatherings with 250 people or more should be rescheduled or canceled."

50.     On March 12, Governor Newsom issued Executive Order No. 25-20 stating that, "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."

51.     On March 19, 2020, Governor Newsom issued Executive Order No. 33-20.  The Order mandated that all Californians "stay home or at their place of residence" in order to mitigate the spread of COVID-19.  The March 19 Order restricted all non-essential travel and most activities outside the home.

52.     On March 19, 2020, the Public Health Officer of the State of California issued an order mandating that "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."

53.     On March 19, 2020, the Health Officer of the County of Sacramento issued an order entitled, "Order . . . Directing All Individuals Living in the County to Stay at Home . . ."  The Order prohibited "All public and private gatherings of any number of people occurring outside a household or living unit," and "All travel, including, but not limited to, travel on foot, bicycle, scooter, motorcycle, automobile, or public transit," other than defined categories of "Essential Travel."  The Order also mandated, "All businesses with a facility in the County, except Essential Businesses . . . are required to cease all activities at facilities located within the County

---

[4] *See* https://sac-epidemiology.maps.arcgis.com/apps/MapSeries/index.html?appid=e11bc926165742ab99f834079f618dad (last visited March 10, 2021).

1    except Minimum Basic Operations."

2         54.     Since the State of California and Sacramento County issued the initial Stay at

3    Home Orders in March 2020, state and local authorities have issued additional orders (1) requiring

4    residents to "Continue Staying at Home," (2) prohibiting gatherings, (3) prohibiting non-essential

5    travel, and (4) restricting the operations of certain business types including those operated by

6    Plaintiffs.

7         (a)     On or about April 7, 2020, the Sacramento County Public Health Officer

8    issued an order entitled, "Order . . . Directing All Individuals Living in the County to Continue

9    Staying at Home. . . ."

10         (b)     On or about April 28, 2020, Governor Newsom announced a four-stage plan

11    to reopen California.  The plan stated that in Stage 2, curbside pickup would be permitted for retail

12    businesses.  Live sporting events with fans and concerts would not be permitted until the state

13    entered "Stage 4," *i.e.*, the "End of Stay at Home Order."

14         (c)     On or about May 1, 2020, the Sacramento County Public Health Officer

15    issued an order entitled, "Order . . . Directing All Individuals Living in the County to Continue

16    Staying at Home. . . ."

17         (d)     On or about May 7, 2020, the Public Health Officer of the State of

18    California issued an order permitting local jurisdictions to move into "Stage 2" reopening.  The

19    Order specifies that other than the modifications made in the May 7, 2020 Order, the "March 19,

20    2020, Order otherwise remains in full effect."

21         (e)     On or about May 22, 2020, the Sacramento County Public Health Officer

22    issued an order entitled, "Order . . . Directing All Individuals Living in the County to Continue to

23    Stay at Home. . . ."

24         (f)     On or about May 26, 2020, the Sacramento County Public Health Officer

25    issued an order entitled, "Order . . . Directing All Individuals Living in the County to Continue to

26    Stay at Home. . . ."

27         (g)     On or about June 12, 2020, the Sacramento County Public Health Officer

28    issued an order entitled, "Order . . . Directing All Individuals Living in the County to Continue to

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · Fax 415.989.1663

**COMPLAINT FOR DAMAGES**

1    Stay at Home. . . .”

2        (h)    On or about June 19, 2020, the Sacramento County Public Health Officer

3    issued an order entitled, “Order . . . Directing All Individuals Living in the County to Continue to

4    Stay at Home. . . .”

5        (i)    On or about June 29, 2020, the Sacramento County Public Health Officer

6    issued an order entitled, “Order . . . Directing All Individuals Living in the County to Continue to

7    Stay at Home. . . .”

8        (j)    On or about July 2, 2020, the Sacramento County Public Health Officer

9    issued an order entitled, “Order . . . Directing All Individuals Living in the County to Continue to

10   Stay at Home. . . .”

11       (k)    On or about July 14, 2020, the Sacramento County Public Health Officer

12   issued an order entitled, “Order . . . Directing All Individuals Living in the County to Continue to

13   Stay at Home. . . .”

14       (l)    On or about August 31, 2020, Sacramento County Public Health Officer

15   issued an order entitled, “Order . . . Directing All Individuals Living in the County to Continue to

16   Stay at Home. . . .”

17       (m)    At the time each of the above orders was issued, COVID-19 was present—

18   including in the air, on surfaces, in the HVAC and other systems, and in individuals infected by

19   it—within five miles of the insured locations.

20   **V.    The Pandemic Impacts Plaintiffs**

21       55.    On March 11, 2020, the day that Governor Newsom issued guidance against

22   gatherings of 250 people or more, the NBA issued a statement that the NBA schedule would be

23   interrupted after a Utah Jazz player tested positive for COVID-19.  The statement said that, “The

24   NBA will use this hiatus to determine next steps for moving forward in regard to the coronavirus

25   pandemic.”

26       56.    On March 11, 2020, the Sacramento Kings were scheduled to play the New Orleans

27   Pelicans at the Golden 1 Center.  Shortly before tipoff, the game was cancelled, and the crowd

28   already assembled had to exit the arena.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

57.    On March 12, 2020, the same day that Governor Newsom issued the Executive Order prohibiting gatherings of 250 or more, the NCAA cancelled the 2020 Men's basketball tournament, including those games being hosted in part at Golden 1 Center.

58.    On March 12, 2020, AEG and Live Nation announced that it was postponing all concerts and events nationwide.

59.    Ultimately, Arena Plaintiffs were forced to cancel all events at the Golden 1 Center from March 12, 2020 to present.  These events included, among many others, Sacramento Kings games, NCAA tournament games, concerts by top musical acts such as Billie Eilish, Bon Jovi, Camila Cabello, a talk by former First Lady Michelle Obama, and graduation for Sacramento State University.[5]

60.    The inability to host events at the Golden 1 Center has been devastating to Arena Plaintiffs' business and caused them to sustain substantial damages and losses.

61.    Likewise, occupancy at the Kimpton Sawyer Hotel dropped to near zero as a result of the stay at home orders.  In late March 2020, the Kimpton Sawyer Hotel suspended all operations and shut down in direct response to the government orders.  The Hotel remained closed until June 2020, when subsequently issued government orders permitted it to reopen with substantially reduced occupancy and only partial operations.  It was not until June 1, 2020 that the Hotel was able to resume food service, and since then has been almost entirely outdoor dining only.

62.    Foot traffic, retail sales, and parking revenues at the Sacramento Downtown Commons also dropped to near zero as a result of the initial stay at home orders, which prohibited opening of the retail locations and prohibited consumers from visiting those locations. Subsequently issued orders have permitted the retail shops to reopen, but with reduced capacity, and have periodically permitted, and then again prohibited, restaurants from providing highly restricted forms of dining (such as reduced indoor capacity or outdoor-only dining).  As a result, the rent payments from retail tenants have declined dramatically.

---

[5] NBA games did not return to Golden 1 Center until January 2021 and, even then, fans were not permitted to attend.

## VI.    The Policy Covers Plaintiffs' Losses

63.    The Policy provides coverage to each of the Plaintiffs and the specified locations.

64.    Each Plaintiff suffered the actual physical loss and damage of property insured by the Policy.

65.    Each Plaintiff has sustained actual losses and incurred extra expenses as a result of cases of COVID-19, the coronavirus, and related government orders.

66.    Plaintiffs gave timely notice of their losses and damages and that they were tendering coverage under the Policy and have satisfied, are excused from performing, or Factory Mutual has waived or is estopped from insistence upon performance of, all conditions of the Policy, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a Proof of Loss.  A summary of some of the implicated coverages follows.

### A.    Plaintiffs Losses Are Covered Under The "All Risks" Portion Of The Policy.

67.    The Policy covers Plaintiffs "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded."  Each Plaintiff has suffered physical loss and damage to facilities/locations insured by the Policy as a result of one or more of the covered "all risks." The risks for which coverage is claimed and sought are not excluded in the Policy.

68.    The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air.  Such substances are not incorporeal, but rather have a material existence and are physically dangerous.

69.    Individuals with COVID-19 or otherwise carrying the coronavirus have been physically present at the insured facilities of each Plaintiff.  Coronavirus-containing fomites (*i.e.*, inanimate objects), respiratory droplets, and nuclei from those individuals have come into contact with, adhered to, and attached to the surfaces of the property upon which they landed, including without limitation, the real property, fixtures and personal property at the insured facilities.

70.    Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei have physically altered the property to which they adhered, attached and/or came into contact, including without limitation by altering the surfaces of that property and/or by making physical

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

1   contact with those previously safe, inert materials dangerous.

2        71.     When individuals carrying the coronavirus breathe, talk, cough, or sneeze, they

3   expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the

4   premises unsafe and affirmatively dangerous.  In addition, the coronavirus physically alters the air.

5   Air inside buildings that was previously safe to breathe, but can no longer safely be breathed due

6   to coronavirus and COVID-19, has undergone a physical alteration.

7        72.     The presence of the coronavirus and COVID-19, including but not limited to

8   coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and

9   will continue to cause physical damage to physical property and ambient air at those premises.

10   Coronavirus, a physical substance, has attached and adhered to Plaintiffs' property, and by doing

11   so, altered it.  Such presence has also directly resulted in loss of use of those facilities.

12        73.     On March 11, 2020, the Golden 1 Center was set to host an NBA basketball game

13   between the Sacramento Kings and the New Orleans Pelicans.  Thousands of fans were present at

14   the Golden 1 Center before the game was cancelled due to concerns about COVID-19.

15        74.     As of March 11, 2020, and at times subsequent, COVID-19 was and has been

16   present in the Golden 1 Center—including in the air, on surfaces, in the HVAC and other systems,

17   and in individuals infected by it.

18        75.     Further, persons who tested positive for COVID-19 were present at the Golden 1

19   Center, the Kimpton Sawyer Hotel, and nearby insured retail locations around the time that they

20   tested positive for COVID-19.

21        76.     Coronavirus droplets have been conveyed from infected persons (whether

22   symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to

23   furniture, doors, floors, elevator buttons, bathroom facilities, lockers, equipment, and supplies, and

24   into the air and HVAC systems at the insured property, causing damage and alteration to such

25   physical property and ambient air at the premises.  Aerosolized coronavirus has entered the air in

26   Plaintiffs' insured facilities.

27        77.     Each Plaintiff has sustained actual loss, including but not limited to substantial

28   sums spent to remediate physical damage to its property, such as for cleaning and disinfecting

premises, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, and other measures to reduce or eliminate the presence of the coronavirus on its property. Such remediation measures have been ongoing because of the continuous and repeated recurrence of the coronavirus while the pandemic persists.

78.     In addition to physical damage, Plaintiffs have also suffered physical loss to the insured properties.  The on-site coronavirus, fomites, and respiratory droplets or nuclei containing the coronavirus have attached to and completely deprived Plaintiffs of the intended physical use of their insured properties by making them unsafe and unusable.

79.     These physical losses to each Plaintiff's insured properties include without limitation the rendering of its insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property.

80.     These physical losses to each Plaintiffs' insured properties include without limitation the physical loss of the ability to use Plaintiffs' properties for their primary functions.

81.     The Plaintiffs' losses arise from physical loss and damage and thus are within the "ALL RISKS OF PHYSICAL LOSS OR DAMAGE" coverage in addition to other coverage grants of the Policy.

**B.     Plaintiffs' Losses Are Covered Under The Time Element And Contingent Time Element Provisions.**

82.     The requirements for coverage under the Civil or Military Authority extension are: (1) an order of a civil authority that limits, restricts or prohibits access to the insured's location, and (2) "such order is the direct result of physical damage of the type insured at the insured location or within five miles of it." Ex. A at 51.

83.     Beginning on or about March 12, 2020, each Plaintiff was "restrict[ed] or prohibit[ed] [from] partial or total access to an insured location."  As a result of the March 12 Order, and also subsequent occurrences, Arena Plaintiffs were unable to host events at the Golden 1 Center.  Plaintiff Hotel was restricted from hosting long-planned events, lost the lodgings associated with those events, and lost the food service and other revenues associated with

those lodgings and events.  Certain tenants in Plaintiff Retail's locations were required to close or reduce their operating capacities and, as a result, many lost their ability to pay rent at all and others lost revenues that, in turn, decreased the rent paid to Plaintiff Retail.

84.     Governor Newsom's Order was the "the direct result of" the presence of COVID-19 "at the insured location or within five miles/eight kilometers of it."

85.     At the time that Governor Newsom issued the Executive Order banning gatherings of 250 people or more, COVID-19 was present at the Golden 1 Center, the Kimpton Sawyer Hotel, and Sacramento Downtown Commons.

86.     The presence of COVID-19 at a location causes physical damage.

87.     A cloud of droplets of saliva or nasal discharge of an infected person, which may be released by a cough, a sneeze, or loud speech, lingers in the air for a period of minutes to hours, and is pulled into air circulation systems.

88.     Physical droplets containing the coronavirus land on objects and surfaces.  After landing on objects and surfaces, the coronavirus remains present and dangerous for periods ranging up to many days.  People can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth.

89.     Plaintiffs are informed and believe and thereon alleged that the coronavirus is present on certain surfaces even weeks after infected persons are present at a given location.

90.     COVID-19 is also "physical damage of the type insured" under the Policy.

91.     The phrase "physical damage of the type insured," is not defined in the Policy.  The plain meaning of the phrase and the context of its use is that all, not just certain, types of "physical damage of the type insured" are covered by the Civil Authority provision.  Moreover, the phrase, "physical damage of the type insured" is broader than physical damage that is *actually covered*.  It also includes physical damage "of the type" insured.

92.     "Physical damage of the type insured" certainly includes all physical damage that is *actually* insured elsewhere under the Policy.  Specifically, the "Property" portion of the Policy provides coverage for "Communicable Disease Response" and the Time Element Coverage Extensions provides coverage for "Interruption by Communicable Disease."  Thus, given that

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

communicable disease losses *are insured elsewhere* under the Policy, including the Property loss sections of the Policy, and given that COVID-19 is a communicable disease under the Policy, the presence of COVID-19 at an insured location or within five miles of it constitutes "physical damage of the type insured" triggering Civil or Military Authority provision coverage.

93.     The Contingent Time Element Extended provision of the Policy applies to actual losses sustained due to "physical loss or damage of the type insured to property of the type insured" at "contingent time element locations," and specifically applies to extend Civil Authority coverage to the Contingent Time Element Location.

C.     <u>**Each New Civil Authority Order Restricting Access To The Insured Locations Constitutes A New Occurrence**</u>.

94.     The Policy defines an "occurrence" to be, "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, . . ."

95.     The issuance of each new State and County Civil Authority Order, constitutes a separate occurrence under the Policy.

D.     <u>**Plaintiffs Have Coverage For Communicable Diseases**</u>.

96.     Plaintiffs' Policy also includes coverage for communicable diseases.

97.     The Policy defines "communicable disease" to mean a disease that is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."

98.     In "Additional Coverages," the Policy provides coverage in a "Communicable Disease *Response*" provision for the "cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property."

99.     Moreover as an "Additional Time Element Extension," the Policy provides coverage for "*Interruption* by Communicable Disease."  This provision covers "Actual Loss Sustained" and "Extra Expenses" incurred where an insured Location "has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by:  (1) an order of an authorized governmental agency regulating the actual not

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1  suspected presence of communicable disease; or (2) a decision of an Officer of the Insured as a

2  result of the actual not suspected presence of communicable disease."  Ex. A at 57.

3      100.    These coverages for communicable diseases (the "Communicable Disease

4  Coverage") are designed and intended and reasonably understood to be ***additional*** coverage

5  extensions.  They are intended to supplement, not to supplant or limit, other coverages provided

6  under the Policy.  The Policy does not state anywhere that these additional communicable disease

7  coverages are the sole and exclusive coverages that apply to loss or damage related to

8  communicable disease, or that the all risks Policy's other coverages do not apply if either or both

9  of these communicable disease coverages are also triggered.

10     **E.    Plaintiffs' Losses Are Covered Under Any And All Other Applicable Coverage
       Provisions.**

11

12     101.    In addition to the damages, losses and/or coverages described above, Plaintiffs'

13  COVID-19 losses are covered under any and all other coverages under the all risks Policy that

14  apply.

15     **F.    No Exclusion In The Policy Precludes Or Limits Coverage For Plaintiffs'
       Losses.**

16

17     102.    The Policy does not contain any exclusions that apply to preclude or limit coverage

18  for Plaintiffs' losses and damages.

19     103.    None of the exclusions contained in the Policy preclude coverage for losses or

20  damage due to communicable disease, including COVID-19, or due to the virus that causes

21  COVID-19.

22     104.    The exclusions in the Policy do not preclude coverage for losses or damage arising

23  out of an order of a civil authority that limits, restricts or prohibits partial or total access to an

24  insured location, issued due to physical damage caused by COVID-19 and the coronavirus.

25     105.    In particular, notwithstanding Defendant's arguments to the contrary in wrongfully

26  denying Plaintiffs' claim, the Contamination Exclusion as used in the policy does ***not*** apply to

27  "communicable disease" such as COVID-19.  Ex. A at 18.

28     106.    The Policy's exclusion for "contamination" states that:

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

18467.001 4838-2671-2031

18

D. This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1) contamination, and any **cost** due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If contamination due only to the actual not suspected presence of contaminant(s) directly results **from other physical damage not excluded** by this Policy, then only physical damage caused by such contamination **may be insured**. (Emphasis added.)

107.    The Policy's definition of "contamination" includes general references to "pathogen or pathogenic organism," "virus," or "disease causing or illness causing agent," but does not include "communicable disease."  *Id.* at 68.

108.    The Policy's exclusion for "contamination" does not exclude coverage for communicable diseases, like Covid-19, for at least three reasons.

109.    First, the bolded lead in the clause quoted in paragraph 106, above, "unless directly resulting from other physical damage not excluded by this Policy," creates a broad exception to the "contamination exclusion."  The Policy provides business interruption coverage from physical damage resulting from the COVID-19 orders through the Civil Authority Order provision.  The Policy also provides coverage for communicable diseases in the "Communicable Disease Coverage Provisions."  Thus, the generic "contamination" exclusion is, by its own terms, not applicable to Plaintiffs' COVID-19 losses and damages in this case.

110.    Second, the Contamination Exclusion directly conflicts with the Policy's affirmative coverage grant for communicable diseases.  If the contamination exclusion did apply to a communicable disease like COVID-19, as Factory Mutual has argued, the exclusion would swallow the Communicable Disease Coverage Provisions as a whole.

111.    Third, the generic "contamination" exclusion, if it were applicable at all, expressly excludes coverage for "costs" but makes no mention of "losses" or "damages."  Virtually all of Plaintiffs' losses under the Policy are "losses" as that term is used in the Policy, not "costs" as that different term is used.  Where the contamination exclusion applies, it pertains to cost-based claims.  The exclusion does not purport to apply to time element losses and other physical damages of the type insured, including but not limited to losses and damages due to civil authority

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1    orders or interruption by communicable disease.

2    112.    Thus, because the Policy's Contamination Exclusion does not exclude coverage for

3    communicable diseases or civil authority orders directly resulting from a communicable disease

4    like COVID 19, it does not preclude coverage for Plaintiffs' claimed losses due to COVID-19,

5    either under the "All Risks" coverage, the Civil Authority Order coverage, or other coverages

6    provided in the Policy.

7    **VII.    Factory Mutual's Breach Of Good Faith And Fair Dealing**

8    113.    Factory Mutual's failure to diligently pursue a thorough, fair, and objective

9    investigation of Plaintiffs' claim and its improper denial of coverage constitute a breach of the

10   covenant of good faith and fair dealing that is implied in every insurance policy.

11   114.    Factory Mutual's denial of coverage misstates the law and fails to adequately

12   address the multiple coverages to which Plaintiffs are entitled under the Policy for their claim, as

13   alleged in this Complaint.

14   115.    Factory Mutual's bad-faith denial of coverage for Plaintiffs' claim, in direct

15   contradiction to the Policy's plain and unambiguous terms, is evident from the circumstance that

16   Factory Mutual acknowledged that COVID-19 constitutes a Communicable Disease as defined in

17   the Policy.  Factory Mutual nevertheless maintains that COVID-19 also falls within the

18   Contamination Exclusion, which blatantly ignores that the parties agreed to add "Communicable

19   Disease" coverage to the Policy via a coverage extension.

20   116.    Factory Mutual's conduct with respect to Plaintiffs is consistent with and part of an

21   orchestrated campaign that Factory Mutual has engaged in throughout the country.  Plaintiffs are

22   informed and believe, and on that basis allege, that Factory Mutual has made a policy of

23   misrepresenting policy terms and making burdensome information requests to innumerable other

24   Factory Mutual policyholders, with the objective of dissuading them from pursuing covered

25   insurance claims.

26   117.    Subsequent to submitting its claim to Factory Mutual, Plaintiffs learned that

27   Factory Mutual had already adopted a company-wide position on coverage for COVID-19 claims,

28   and issued guidelines to all of its claims handlers across the company to ensure that Factory

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1  Mutual's adjusters reached the same conclusion for all COVID-19 claims.  Plaintiffs are informed

2  and believe, and on that basis allege, claims personnel are instructed to follow the Factory Mutual

3  "Talking Points," without regard to any individual investigation of each individual claim.  Thus,

4  Factory Mutual instructed all of its claims personnel to deny coverage under several pertinent

5  coverage grants regardless of what the claims handler's investigation revealed.

6       118.    By issuing a blanket directive to all of its claims personnel on what portions of

7  every COVID-19 claim to accept and/or deny, the Factory Mutual Talking Points ensure that its

8  claims personnel do not undertake any proper or independent investigation of the claim to arrive at

9  an independent coverage determination.

10       119.    Factory Mutual's failure to diligently pursue a thorough, fair, and objective

11  investigation of Plaintiffs' claim and improper denial of coverage constitutes a violation of the

12  California common law principles of good faith, California Insurance Code and the UCl which are

13  implied in insurance contracts.

14  ### CAUSES OF ACTION

15  ### FIRST CAUSE OF ACTION
16  **(Declaratory Relief Against Factory Mutual and each of Does 1-10)**

17       120.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this

18  Complaint, inclusive, as though set forth fully herein.  Plaintiffs assert this cause of action against

19  Defendant Factory Mutual and each of Does 1-10.

20       121.    Plaintiffs seek a declaration of the parties' rights and duties under the Policy

21  pursuant to 28 U.S.C. §2201.

22       122.    An actual and justiciable controversy exists between Plaintiffs and Factory Mutual

23  concerning Factory Mutual's contractual duties to pay Plaintiffs' claim under the Policy.

24       123.    The controversy between Plaintiffs and Factory Mutual is ripe for judicial review.

25       124.    The controversy is of sufficient immediacy to justify the issuance of declaratory

26  relief.

27       125.    Plaintiffs accordingly seek a declaration from the Court that:

28       (a)    Each and every coverage provision identified in the Complaint is triggered

1  by Plaintiffs' claim;

2          (b)      No exclusion in the Policy applies to preclude or limit coverage for

3  Plaintiffs' claim;

4          (c)      The Policy covers Plaintiffs' claim; and

5          (d)      Any other declaratory relief that would be useful to the resolution of the

6  dispute between the parties.

7                    <u>SECOND CAUSE OF ACTION</u>
             **(Breach of Contract Against Factory Mutual and each of Does 1-10)**
8

9          126.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this

10  Complaint, inclusive, as though set forth fully herein.  Plaintiffs assert this cause of action against

11  Defendant Factory Mutual and each of Does 1-10.

12          127.    The Policy is a valid and enforceable contract between Plaintiff Sacramento

13  Downtown Arena and Factory Mutual, as to which the other Plaintiffs are additional insureds and

14  intended third-party beneficiaries.

15          128.    Plaintiffs have sustained covered losses under the Policy and, accordingly,

16  submitted their claim to Factory Mutual.

17          129.    Factory Mutual has wrongfully refused to provide coverage for Plaintiffs' claim in

18  breach of the Policy.

19          130.    As set forth above, the Policy provides coverage for Plaintiffs' losses.

20          131.    No exclusions apply to preclude or limit coverage.

21          132.    Plaintiffs have fully complied with all of the terms and conditions of the Policy and

22  have satisfied any and all conditions precedent to coverage under the Policy, including but not

23  limited to paying premiums, providing timely notice of the claim, and taking all reasonable steps

24  to protect the property from further damage.

25          133.    To the extent that Plaintiffs have not complied with a condition in the Policy, it is

26  because any such condition does not apply or has been waived by Factory Mutual.

27          134.    Factory Mutual's failure to pay amounts due and its actions in handling Plaintiffs'

28  claim under the Policy constitutes a breach of contract.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1  135.  In consequence of Factory Mutual's breach of contract, Plaintiffs have suffered and

2  continue to suffer significant damages.

3  136.  Plaintiffs are entitled to coverage up to the Policy's limit of liability or any

4  applicable sublimits.

5  137.  Plaintiffs are entitled to damages as a result of Factory Mutual's breach of contract

6  in an amount to be determined at trial, for all damages and losses they have suffered, including

7  pre- and post-judgment interest, and all other costs and relief that this Court deems appropriate.

8  **THIRD CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing**
9  **Against Factory Mutual and each of Does 1-10)**

10  138.  Plaintiffs repeat and reallege the allegations in the preceding paragraphs of this

11  Complaint, inclusive, as though set forth fully herein.  Plaintiffs assert this cause of action against

12  Defendant Factory Mutual and each of Does 1-10.

13  139.  Plaintiffs have suffered loss covered under the Policy.

14  140.  Plaintiffs properly presented their claim to Factory Mutual to be compensated for

15  their losses.

16  141.  Factory Mutual failed to conduct a full, fair, prompt, and thorough investigation of

17  all of the bases of Plaintiffs' claim.

18  142.  When investigating Plaintiffs' claim, Factory Mutual had a duty to diligently search

19  for and consider evidence that supported coverage for the claimed loss.

20  143.  Factory Mutual (1) failed to diligently pursue a thorough, fair, and objective

21  investigation of Plaintiffs' claim; (ii) improperly denied coverage based on its position that there

22  was no direct physical loss of or damage to property, which is incorrect; and (iii) improperly

23  asserted that the Contamination Exclusion bars coverage for Plaintiffs' claimed losses due to

24  COVID-19, where such exclusion does not exclude coverage for a communicable disease such as

25  COVID-19 and where such exclusion directly contradicts affirmative coverage grants in the

26  Policy.

27  144.  In handling Plaintiffs' claim under the Policy, Factory Mutual has failed to

28  faithfully apply the language of the Policy that it drafted, ignored longstanding principles of

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1  California insurance law, failed to conduct a reasonable investigation, and failed to consider the

2  facts relevant to the claim against the language of the Policy as interpreted pursuant to California

3  law.

4         145.  For the reasons set forth above, Factory Mutual's withholding of the benefits due is

5  unreasonable and constitutes bad faith.

6         146.  Plaintiffs have been harmed by Factory Mutual's conduct.

7         147.  Due to Factory Mutual's conduct, Plaintiffs have suffered and continue to suffer

8  ascertainable losses, and Plaintiffs will continue to incur reasonable attorneys' fees in order to

9  enforce their rights.

10                          **PRAYER FOR RELIEF**

11         Plaintiffs pray for judgment against Factory Mutual as follows:

12         1.  A declaration from the Court that:

13              (a)  Each of the coverage provisions identified herein is triggered by Plaintiffs'

14  claim;

15              (b)  No exclusion under the Policy applies to bar or limit coverage for Plaintiffs'

16  claim;

17              (c)  The Policy covers Plaintiffs' claim;

18              (d)  Any other declaratory relief that would be useful to the resolution of the

19  dispute between the parties;

20         2.  For special and consequential damages against Factory Mutual in an amount to be

21  proven at trial in excess of $75,000;

22         3.  For punitive and exemplary damages as provided by law;

23         4.  For pre- and post-judgment interest as provided by law;

24         5.  For an award of attorneys' fees and costs of suit incurred; and

25         6.  For such other and further relief as the Court deems just and proper.

26  ///

27  ///

28  ///

**COMPLAINT FOR DAMAGES**

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand trial by jury on all issues so triable.

3

DATED:  March 11, 2021            COBLENTZ PATCH DUFFY & BASS LLP

4

5

By:   */s/ Howard A. Slavitt*

6

HOWARD A. SLAVITT
Attorneys for Plaintiffs

7

SACRAMENTO DOWNTOWN ARENA, LLC;
SACRAMENTO KINGS LIMITED

8

PARTNERSHIP; SAC MUB1 HOTEL, LLC; and
SGD RETAIL LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663