JOYCE C. WANG (Bar No. 121139)
jwang@ccplaw.com
LISA L. KIRK (Bar No. 130272)
lkirk@ccplaw.com
CARLSON, CALLADINE & PETERSON LLP
353 Sacramento St., 16th Floor
San Francisco, California 94111
Telephone:    (415) 391-3911
Facsimile:    (415) 391-3898

BRYCE L. FRIEDMAN
(*pro hac vice application pending*)
bfriedman@stblaw.com
ISAAC RETHY (*pro hac vice*)
irethy@stblaw.com
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone:    (212) 455-2000
Facsimile:    (212) 455-2502

*Attorneys for Defendant Factory Mutual
Insurance Company*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| SACRAMENTO DOWNTOWN ARENA LLC; SACRAMENTO KINGS LIMITED PARTNERSHIP; SAC MUBI HOTEL, LLC; and SGD RETAIL LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>FACTORY MUTUAL INSURANCE COMPANY, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No. 2:21-cv-00441-KJM-DB<br><br>**DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MOTION FOR RECONSIDERATION, OR FOR CERTIFICATION OF AN INTERLOCUTORY APPEAL**<br><br>Date:        January 27, 2023<br>Time:        10:00 a.m.<br>Courtroom: 3 |

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         Please take notice that on January 27, 2023 at 10:00 am, in Courtroom 3 of the United

3    States District Court, Eastern District of California, located at 501 I Street, Sacramento,

4    California, 95814, Defendant Factory Mutual Insurance Company ("FM") will move this

5    Court for an order granting FM's Motion for Reconsideration pursuant to Federal Rule of

6    Civil Procedure 59(e) and Local Rule 230(j), or for Certification of an Interlocutory Appeal

7    pursuant to 28 U.S.C. § 1292(b), and a stay.  Prior to the filing of this Motion, the parties

8    met and conferred regarding its substance.  The parties were unable to reach any resolution.

9         This Motion is based on this Notice of Motion, FM's Memorandum of Points and

10   Authorities and its annexed exhibits, and all records and papers on file in this action; any

11   oral argument; and any such further evidence that the Court may consider in hearing this

12   motion.

13   Date:  November 23, 2022

14                                    By: */s/ Joyce C. Wang*
                                      JOYCE C. WANG (Bar No. 121139)
15                                    LISA L. KIRK (Bar No. 130272)
                                      CARLSON, CALLADINE & PETERSON LLP
16                                    353 Sacramento Street, 16th Floor
                                      San Francisco, California 94111
17                                    Telephone: (415) 391-3911
                                      Email: jwang@ccplaw.com
18                                            lkirk@ccplaw.com

19
                                      BRYCE L. FRIEDMAN
20                                    (*pro hac vice application pending*)
                                      ISAAC RETHY (*pro hac vice*)
21                                    SIMPSON THACHER & BARTLETT LLP
                                      425 Lexington Avenue
22                                    New York, New York 10017
                                      Telephone: (212) 455-2000
23                                    Email: bfriedman@stblaw.com
                                              irethy@stblaw.com
24

25
                                      *Attorneys for Defendant Factory Mutual Insurance*
26                                    *Company*

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 3

ARGUMENT .................................................................................................... 4

I.    RECONSIDERATION IS WARRANTED BECAUSE THE
ORDER CONFLICTS WITH THE NINTH CIRCUIT'S RULING
IN *OUT WEST* ................................................................................... 4

    A.    The Order Conflicts With *Out West* ...................................... 5

    B.    General Language In The Policy's Declarations And
"Additional Coverages" Sections Does Not Distinguish *Out
West* ........................................................................................ 7

    C.    The Order's Construction Of The Contamination Exclusion Is
Clear Error And Contrary To Ninth Circuit Law ................... 9

    D.    Reconsideration Is Also Warranted Because The Order Is
Contrary To The Great Weight Of Authority ....................... 13

II.    IN THE ALTERNATIVE, THIS COURT SHOULD CERTIFY AN
IMMEDIATE APPEAL UNDER SECTION 28 U.S.C. § 1292(b) .............. 17

    A.    The Court's October 28, 2022 Order Presents A Controlling
Question Of Law .................................................................. 17

    B.    A Substantial Ground For Difference Of Opinion Exists
Regarding Whether The COVID-19 Virus Causes Physical
Loss Or Damage To Property Under The FM Policy ........................ 18

    C.    An Immediate Appeal Will Materially Advance The Ultimate
Termination Of The Litigation ............................................ 18

    D.    If Certification Is Granted, Proceedings Should Be Stayed
While The Appeal Is Pending ............................................. 19

CONCLUSION ............................................................................................... 19

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Am. Ironworks & Erectors Inc. v. N. Am. Constr. Corp.*,
  248 F.3d 892 (9th Cir. 2001)...............................................................................4

*AU Health Sys. v. Affiliated FM Ins. Co.*,
  No. CV 121-019, 2022 WL 801513 (S.D. Ga. Mar. 15, 2022) ............................14, 16

*Broad Wall Mgmt. Corp. v. Affiliated FM Ins. Co.*,
  No. 21-CV-10247 (PAE), 2022 WL 3030315 (S.D.N.Y. Aug. 1, 2022)....................14

*Conte v. Jakks Pac., Inc.*,
  No. 1:12–CV–00304, 2012 WL 3069971 (E.D. Cal. July 27, 2012)..........................18

*Cordish Cos. v. Affiliated FM Ins. Co.*,
  573 F. Supp. 3d 977 (D. Md. 2021),
  *aff'd*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022) ...............................13

*Couch v. Telescope Inc.*,
  611 F.3d 629 (9th Cir. 2010) .................................................................................17, 18

*Creative Artists Agency, Ltd. Liab. Co. v. Affiliated FM Ins. Co.*,
  No. 2:21-CV-08314-AB, 2022 WL 3097371 (C.D. Cal. July 27, 2022)....................14

*Dana Inc. v. Zurich Am. Ins. Co.*,
  No. 21-4150, 2022 WL 2452381 (6th Cir. July 6, 2022).......................................1, 11

*Davis v. Farmers Ins. Grp.*,
  134 Cal. App. 4th 100 (2005) ...............................................................................12

*Filtrol Corp. v. Kelleher*,
  467 F.2d 242 (9th Cir. 1972).................................................................................19

*Froedtert Health Inc. v. Factory Mut. Ins. Co.*,
  No. 21-CV-0713-BHL, --- F.Supp.3d ----,
  2022 WL 3213270 (E.D. Wis. Aug. 9, 2022) ........................................................13, 14

*George Washington Univ. v. Factory Mut. Ins. Co.*,
  No. 21-CV-3006, --- F.Supp.3d ----,
  2022 WL 4078942 (D.D.C. Sept. 6, 2022) ............................................................13

*Holak v. K Mart Corp.*,
  No. 1:12-CV-00304-AWI, 2015 WL 4756000 (E.D. Cal. Aug. 11, 2015) ...............18

*In re Cement Antitrust Litig.*,
  673 F.2d 1020 (9th Cir. 1982)..............................................................................17, 18

*In re DirecTV Early Cancellation Litig.*,
  738 F. Supp. 2d 1062 (C.D. Cal. 2010) ................................................................5

*In re Tobacco Cases I,*
    186 Cal. App. 4th 42 (2010) ........................................................................ 12

*Islands Rests., Ltd. P'ship v. Affiliated FM Ins. Co.*,
    532 F. Supp. 3d 948 (S.D. Cal. 2021) ......................................................... 14

*ITT Inc. v. Factory Mut. Ins. Co.*,
    No. 3:21CV00156, 2022 WL 1471245 (D. Conn. May 10, 2022) .................. 13, 14, 15

*ITT, Inc. v. Factory Mut. Ins. Co.,*
    No. 3:21-cv-00156-SRU, ECF No. 56, Hr'g Tr. (D. Conn. Aug. 3, 2021) ................ 15

*Jordache Enters. v. Affiliated FM Ins. Co.*,
    No. 21-CV-5433 (RA), 2022 WL 986109 (S.D.N.Y. Mar. 31, 2022)........................ 14

*Josephson, LLC v. Affiliated FM Ins. Co.*,
    No. PC-2021-03708, 2022 WL 999134 (R.I.Super. Mar. 29, 2022) .................... 14, 16

*Julian v. Hartford Underwriters Ins. Co.*,
    35 Cal. 4th 747 (2005) ......................................................................... 2, 6

*Klinghoffer v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990)...................................................................... 17

*Lakeland Village Homeowners Ass'n v. Great American Ins. Group*,
    727 F. Supp. 2d 887 (E.D. Cal. 2010)........................................................ 19

*Leyva v. Certified Grocers of Cal., Ltd.*,
    593 F.2d 857 (9th Cir. 1979)................................................................... 19

*Madison Square Garden Sports Corp. v. Factory Mut. Ins. Co.*,
    No. 651521/21, 2022 WL 845245 (N.Y. Sup. Jan. 11, 2022) ........................... 13

*Mars, Inc. v. Factory Mut. Ins. Co.*,
    No. 1:22-cv-00626-PTG, ECF No. 32 (E.D.Va. Oct. 6, 2022)............................ 13

*Mashantucket Pequot Tribal Nation v. Factory Mut. Ins. Co.*,
    No. CV216140378S2021,
    2021 WL 4477089 (Conn. Super. Aug. 18, 2021)........................... 11, 13, 16

*MGA Ent., Inc. v. Affiliated FM Ins. Co.*,
    No. CV-20-10499-MWF (JPRX),
    2021 WL 2840456 (C.D. Cal. July 2, 2021) ................................................ 14

*Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*,
    No. 8:20-CV-701, 2021 WL 1419782 (N.D.N.Y. Apr. 15, 2021)........................ 14

*Mohegan Tribal Gaming Auth. v. Factory Mut. Ins. Co.*,
    No. HHD-CV-21-6147037-S,
    2022 WL 2303841 (Conn. Super. June 8, 2022) ................................... 13, 14

*Monarch Casino & Resort, Inc. v. Affiliated FM Ins. Co.*,
    No. 20-CV-1470, 2021 WL 4260785 (D. Colo. Sept. 17, 2021).................... 14, 16

*Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*,
   No. CV 11-6521-GW(JEMx),
   2013 WL 12306438 (C.D. Cal. Jul. 11, 2013) ................................................................. 5

*Nguyen v. Travelers Cas. Ins. Co. of Am.*,
   541 F. Supp. 3d 1200 (W.D. Wash. 2021) ................................................................. 14

*Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*,
   No. 2:13-CV-02378, 2014 WL 2624981 (E.D. Cal. June 11, 2014) ......................... 19

*Oakland Athletics Baseball Co. v. AIG Specialty Ins. Co.*,
   No. RG20079003, 2022 WL 2526929 (Cal. Super. June 20, 2022) ..................... 13, 15

*Out West Restaurant Group v. Affiliated FM Insurance Co.*,
   No. 21-15585, 2022 WL 4007998 (9th Cir. Sep. 2, 2022) .................................. passim

*Palomar Health v. Am. Guarantee & Liab. Ins. Co.*,
   No. 21-56073, 2022 WL 3006356 (9th Cir. July 28, 2022) .......................................... 1

*Ralph Lauren Corp. v. Factory Mut. Ins. Co.*,
   No. 20-CV-10167, 2021 WL 1904739 (D.N.J. May 12, 2021) ............................ 13, 16

*Reese v. BP Exploration (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ..................................................................................... 18

*Rockhurst Univ. v. Factory Mut. Ins. Co.*,
   582 F. Supp. 3d 633 (W.D. Mo. 2022) .................................................................. 13, 16

*Salon XL Color & Design Grp., LLC v. W. Bend Mut. Ins. Co.*,
   517 F. Supp. 3d 725 (E.D. Mich. 2021) ..................................................................... 16

*San Jose Sharks LLC v. Factory Mut. Ins. Co.*,
   No. 21-CV-383780, 2022 WL 3965662 (Cal. Super. Aug. 8, 2022) .................... 13, 15

*Shakopee Mdewakanton Sioux Comm. v. Factory Mut. Ins. Co.*,
   No. 70-CV-21-6480, 2021 WL 6328369 (Minn. Dist. Ct. Dec. 29, 2021) ................. 13

*Smith v. Clark Cty. Sch. Dist.*,
   727 F.3d 950 (9th Cir. 2013) ....................................................................................... 4

*St. George Hotel Assocs., LLC v. Affiliated FM Ins. Co.*,
   577 F. Supp. 3d 135 (E.D.N.Y. 2021) ....................................................................... 14

*Stant USA Corp. v. Factory Mut. Ins. Co.*,
   No. 1:21-cv-00253-SEB-TAB,
   2022 WL 326493 (S.D. Ind. Feb. 3, 2022) ........................................................... 13, 15

*Tumi, Inc. v. Factory Mut. Ins. Co.*,
   No. 21-CV-02752, 2022 WL 2666950 (D.N.J. July 11, 2022) ............................ 13, 15

*U.S. Rubber Co. v. Wright*,
   359 F.2d 784 (9th Cir. 1966) ...................................................................................... 18

*Union Cty. v. Piper Jaffray & Co.*,
    525 F.3d 643 (8th Cir. 2008)..........................................................................................18

*VIA Techs., Inc. v. SonicBlue Claims, LLC*,
    No. C 09-2109 PJH, 2011 WL 2437425 (N.D. Cal. June 17, 2011) ...........................17

*Zebra Techs. Corp. v. Factory Mut. Ins. Co.*,
    No. 20-cv-05147, 2021 WL 4459532 (N.D. Ill. Sept. 29, 2021)...........................13, 16

## STATUTES

28 U.S.C. § 1292(b) ..........................................................................................................3, 17

FED. R. APP. P. 5(a)(3) ...........................................................................................................17

FED. R. CIV. P. 54(b) ...............................................................................................................4

FED. R. CIV. P. 59(e) ...............................................................................................................4

## INTRODUCTION

Defendant Factory Mutual Insurance Company ("FM") respectfully seeks reconsideration, or, in the alternative, certification for interlocutory review of the Court's October 28, 2022 Order (ECF No. 45, the "Order").  Reconsideration is warranted because the Order cannot be reconciled with recent Ninth Circuit law concerning COVID-19 coverage claims brought under substantially similar insurance policies.  At a minimum, interlocutory review is warranted because the Order adopts a construction of the insurance policy at issue that none of the numerous courts to consider COVID-19 coverage claims under FM's policy language has accepted.

The Order's construction of the policy's Contamination Exclusion is incompatible with the Ninth Circuit's recent construction of that same exclusion in FM's affiliate's policy. In *Out West Restaurant Group v. Affiliated FM Insurance Co.*, No. 21-15585, 2022 WL 4007998 (9th Cir. Sep. 2, 2022) (unpublished), the Ninth Circuit rejected the argument that "given the policy's inclusion of the communicable disease provisions, the contamination exclusion must refer only to 'viruses that are not communicable diseases,'" finding that "the policy imposes no such limitation." *Id.* at *2.  This is directly contrary to the Order, which found it reasonable that, given the policy's "communicable disease" coverages, the exclusion's scope is limited to "other contaminants listed in the Policy's definitions, those that are not 'communicable diseases.'"  Order at 8.  The Ninth Circuit's construction of the exclusion is consistent with its prior construction of a substantially similar exclusion in *Palomar Health v. Am. Guarantee & Liab. Ins. Co.*, No. 21-56073, 2022 WL 3006356 (9th Cir. July 28, 2022), as well as the Sixth Circuit's decision in *Dana Inc. v. Zurich Am. Ins. Co.*, No. 21-4150, 2022 WL 2452381 (6th Cir. July 6, 2022) and the decisions of almost all other courts to have considered this exclusion.

*Out West* concluded the Contamination Exclusion would bar coverage even assuming viral contamination could otherwise cause "physical loss or damage," stating that "to the extent that Out West argues that infected persons contaminated the property or that the virus was otherwise present, the contamination exclusion would bar coverage under the direct

physical loss or damage policy provisions." 2022 WL 4007998, at \*2. Thus, irrespective of whether alleged contamination of property due to COVID-19 could constitute insured "physical loss or damage" in the absence of the exclusion, the Ninth Circuit held that the only reasonable construction of the policy was one under which the Contamination Exclusion barred coverage except as set forth in the policy's communicable disease coverages. As the Ninth Circuit explained, "'[a]n insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances.'" *Id.* (quoting *Julian v. Hartford Underwriters Ins. Co.*, 35 Cal. 4th 747, 759 (2005)). The Ninth Circuit found this to be "exactly the case here" and affirmed dismissal, holding that "[t]here is thus no conflict between the contamination exclusion, on the one hand, and the communicable disease provisions, on the other, such that the contamination exclusion must be read to refer only to viruses that are not communicable diseases." *Id.*

The Order reached the opposite conclusion, finding that it was reasonable to read the exclusion to omit the terms "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent," at least to the extent those organisms or agents could cause communicable diseases. In so doing, the Order reasoned that the policy "offers coverage only for risks of 'physical loss or damage,'" and reiterates this in prefatory language containing its "Additional Coverages," and thus, since the policy provides communicable disease coverage, such coverage must be coverage for "insured physical loss or damage." Order at 6. From this, the Order concluded that because "communicable disease" could be construed as "insured physical loss or damage," an exception to the exclusion for "contamination directly . . . resulting from other physical damage not excluded by this Policy" could reasonably apply, such that the exclusion would be "no bar to coverage." *Id.* at 9. In substance, the Order concluded that by offering $1 million in "additional coverage" for business closures based on the presence of communicable disease, FM transformed its policy from one that excluded losses due to viral contamination into one that provided potentially billions of dollars of such coverage.

This reasoning cannot be squared with *Out West*.  The substantially similar policy construed by the Ninth Circuit in *Out West*, issued by FM's affiliate, also provides coverage for "all risks of physical loss or damage," contains substantially similar communicable disease coverages, and includes an identical Contamination Exclusion with the same exception for "contamination directly . . . result[ing] from other physical damage not excluded by this Policy."  *See* Appellants' Br., 2021 WL 3073459, at *7–8, *45.  The only distinction is that the policy in *Out West* does not similarly *reiterate* that it provides coverage for "physical loss or damage" in the prefatory language to its "Additional Coverages."  Mere repetition of this same concept cannot reasonably make a dispositive difference in construing the two policies.  And, in any event, the prefatory language in the policy at issue here expressly provides that the Additional Coverages remain subject to "applicable exclusions."  It thus in no way supports a determination that the presence of communicable disease is insured under the policy other than as set forth in the specific Communicable Disease coverages.  "'An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances.'"  *Out West*, 2022 WL 4007998, at *2 (citations omitted).  That is precisely what FM did here.  FM's Motion for Reconsideration should be granted.

At a minimum, certification for interlocutory review under 28 U.S.C. § 1292(b) is appropriate.  The Order is an extreme outlier in accepting that the "Additional Coverages" prefatory language creates a conflict between the communicable disease coverages and the Contamination Exclusion.  Other courts to have considered this argument under FM's policy form have rejected it.  While *Out West* is not binding, it is critical evidence of how the Ninth Circuit would construe this policy, and, in particular, the Contamination Exclusion.  Resolving this important question would materially advance the resolution of this litigation.  All factors relevant to certification under § 1292(b) are thus clearly met.

## BACKGROUND

This dispute concerns a commercial property insurance policy issued by FM to Plaintiffs, who contend they suffered losses due to restrictions on their operations during the

COVID-19 pandemic. The policy insures property against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." Compl., Ex. A, ECF No. 1-1 at 8. The policy's exclusions apply "unless otherwise stated" and operate to bar coverage unless an exception to the exclusion applies. *Id.* at 16. Among others, the policy excludes "contamination, and any cost due to contamination," defined as "any condition of property due to the actual or suspected presence of," *inter alia*, any "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent." *Id.* at 69, 16. The policy also includes, among "Other Additional Coverages" and "Additional Time Element Coverage Extensions," coverages for "Communicable Disease Response" and "Interruption by Communicable Disease." These coverages provide a total of $1,000,000 in coverage (which FM has paid) based on the presence of a communicable disease if a government agency or officer of the insured restricts access to the property for at least 48 hours as a result of such presence.

Plaintiffs initiated this action on March 11, 2021, alleging economic losses as a result of the presence of COVID-19 on their properties and the government-order restrictions issued to combat the pandemic. Compl., ECF No. 1 at ¶¶ 67–90. FM moved to dismiss Plaintiffs' Complaint on May 7, 2021. *See* Mot., ECF No. 10. On October 28, 2022, the Court denied FM's motion. *See* Order, ECF No. 45.

## ARGUMENT

### I.   RECONSIDERATION IS WARRANTED BECAUSE THE ORDER CONFLICTS WITH THE NINTH CIRCUIT'S RULING IN *OUT WEST*

A district court may reconsider its decision if it "committed clear error or the initial decision was manifestly unjust, or [] if there is an intervening change in controlling law." *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 960 (9th Cir. 2013) (citation and internal quotations omitted). "[A] 'motion for reconsideration' is treated as a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e) if it is filed [within the time proscribed by that rule]." *Am. Ironworks & Erectors Inc. v. N. Am. Constr. Corp.*, 248 F.3d 892, 898–99 (9th Cir. 2001). Federal Rule of Civil Procedure 54(b) also empowers courts

to revisit interlocutory orders prior to judgment.  Local Rule 230(j) requires that a motion for reconsideration set forth "what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion[.]"  Reconsideration is warranted here as the Order goes against recent Ninth Circuit case law issued after briefing and argument, as well as the overwhelming majority of courts to consider the same issue in the context of materially identical insurance policies.  *See, e.g.*, *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1069 (C.D. Cal. 2010) (granting motion for reconsideration based on an unpublished Ninth Circuit decision); *Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*, No. CV 11-6521-GW(JEMx), 2013 WL 12306438, at *3 (C.D. Cal. Jul. 11, 2013) ("The first question the Court must resolve is whether it can reconsider a previous order based on a recent change in merely persuasive, as opposed to binding, precedent.  The Court would conclude that it does have this power.").

## A.      The Order Conflicts With *Out West*

The Order conflicts with the Ninth Circuit's recent decision in *Out West*.  In *Out West*, a restaurant group and other related entities sought coverage under a materially identical policy issued by FM's affiliate, Affiliated FM Insurance Co. ("AFM"), for economic losses arising from the purported presence of the COVID-19 virus and COVID-19-related government closure orders.  *Out West*, 2022 WL 4007998, at *1.  The *Out West* court considered and rejected the policyholders' argument that "given the policy's inclusion of the communicable disease provisions, the contamination exclusion must refer only to 'viruses that are not communicable diseases,'" determining that "the policy imposes no such limitation."  *Id.* at *2.  This puts the Court's Order in direct conflict with the Circuit Court's decision.

The *Out West* insureds argued that the Contamination Exclusion could not apply to communicable diseases, because otherwise the exclusion would "eviscerate" the additional grants of communicable disease coverage.  Appellants' Br., 2021 WL 3073459, at *47–48.  This is the same argument this Court relied on in finding that the "[C]ontamination

1   [E]xclusion does not bar coverage for 'other physical damage not excluded by this Policy,'

2   including viral contamination," as the Court found it "reasonable to read the policy as

3   defining the presence of a 'communicable disease' as non-excluded 'physical damage.'"

4   Order at 8.  The Ninth Circuit rejected this argument.  It found that even assuming viral

5   contamination of property was a risk of physical loss or damage otherwise within the scope

6   of the policy, it is excluded by the Contamination Exclusion except for the sub-limited

7   communicable disease coverages when the requirements for that coverage are met.  *See Out*

8   *West*, 2022 WL 4007998, at *2 ("[T]o the extent that Out West argues that infected persons

9   contaminated the property or that virus was otherwise present, the contamination exclusion

10  would bar coverage under the direct physical loss or damage policy provisions.").  The Ninth

11  Circuit reasoned that there was "no conflict between the contamination exclusion, on the one

12  hand, and the communicable disease provisions, on the other," because the policy "cover[s]

13  damage caused by the presence of a virus" only in the specific circumstances set forth in the

14  communicable disease coverages, relying in this regard on California law providing that

15  "'[a]n insurance policy may exclude coverage for particular injuries or damages in certain

16  specified circumstances while providing coverage in other circumstances.'"  *Id.* at *2

17  (quoting *Julian*, 35 Cal. 4th at 759).  *Out West* concluded "[t]here is thus no conflict between

18  the contamination exclusion, on the one hand, and the communicable disease provisions, on

19  the other, such that the contamination exclusion must be read to refer only to viruses that are

20  not communicable diseases."  *Id.*

21          In reaching the opposite result, the Order relied on three provisions in the FM policy.

22  First, the Order explained that "[t]he policy's first sentence explains that it offers coverage

23  only for risks of 'physical loss or damage.'"  Order at 6.  Second, the Order relied on

24  prefatory language at the outset of the subsection of the policy setting forth "Additional

25  Coverages," which states:

26          This Policy includes the following Additional Coverages for insured physical
            loss or damage.
27          These Additional Coverages:
28          1) are subject to the applicable limit of liability;

6

2) will not increase the Policy limit of liability; and
3) are subject to the Policy provisions, including applicable exclusions and deductibles,
all as shown in this section and elsewhere in this Policy.

Compl., Ex. A, ECF No. 1-1 at 22.  The Order concluded that "[a]n insured could reasonably expect, given these terms, that the presence of a communicable disease such as COVID-19 fits under the 'physical loss or damage' umbrella for the policy as a whole."  Order at 6.

Third, the Order relied on a sentence in the Contamination Exclusion stating that "[i]f contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured."  The Order reasoned that because "[t]he contamination exclusion does not bar coverage for 'other physical damage not excluded by this Policy,'" it "is reasonable to read the policy as defining the presence of a 'communicable disease' as non-excluded 'physical damage,' so this exclusion would be no bar to coverage."  Order at 8.

As explained below, none of these provisions, considered either separately or together, justifies an outcome different than that of *Out West*.

**B.  General Language In The Policy's Declarations And "Additional Coverages" Sections Does Not Distinguish *Out West***

As discussed above, the Order relied on two provisions stating that the policy provides coverage for "physical loss or damage" to conclude that the policy therefore "offers coverage *only* for risks of 'physical loss or damage'" and that "[a]n insured could reasonably expect, given these terms, that the presence of a communicable disease such as COVID-19 fits under the 'physical loss or damage' umbrella for the policy as a whole."  Order at 6.  Setting aside the merits of this conclusion—with which FM disagrees[1]—it offers no basis to distinguish this case from *Out West*.

_____

[1] As discussed *infra* at 12–17, other courts have rejected this construction of the "Additional Coverages" prefatory language, recognizing that (i) such a construction would render superfluous the express "physical loss or damage" requirement set forth in many "additional coverages" but not in others (including those for communicable disease) and (ii) it would

As an initial matter, both the policy at issue here and the policy at issue in *Out West* state at their respective outsets that those policies provide coverage for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded."  While the policy at issue here also reiterates that concept in prefatory language to its "Additional Coverages," there is no basis to conclude that such repetition, or the absence thereof, should give rise to a diametrically opposed construction of the two policies.  Indeed, the Order treats the insuring language at the outset of the policy as sufficient, stating that this language "explains that [the policy] offers coverage *only* for risks of 'physical loss or damage,'" thus designating its communicable disease coverages as coverages for "physical loss or damage."  Order at 6. That would apply equally to *Out West*, but was not accepted by the Ninth Circuit in that case.

Further, both the insuring language and the "Additional Coverages" prefatory language expressly incorporate applicable exclusions.  The insuring language (both here and in *Out West*) states that the policies provide for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE ***except as hereinafter excluded***" (Compl., Ex. A, ECF No. 1-1 at 8 & Appellants' Br., 2021 WL 3073459, at *7) and the "Additional Coverages" prefatory language in this case states that the Additional Coverages are "***subject to . . . applicable exclusions***" (Compl., Ex. A, ECF No. 1-1 at 22).  (Emphases added).  Neither provision evinces an intent to override an applicable exclusion; to the contrary, each simply reiterates the basic proposition that coverage is provided under the policy subject to its terms, conditions, and exclusions.

Moreover, as the Order itself recognized, its finding that the policy's communicable disease coverages provide coverage for a form of "physical loss or damage" does not answer the question of whether coverage is provided for "physical loss or damage" due to communicable disease under *other* policy provisions.  That requires interpretation of the Contamination Exclusion.  *See* Order at 8 ("In sum, the plaintiffs have offered a reasonable interpretation of the policy that would bring their alleged losses within the basic scope of

---

nonsensically deem "additional coverages" for matters such as "accounts receivable," "coinsurance deficiency," "crisis management," and "currency devaluation" coverages for "physical loss or damage."

DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MOTION FOR RECONSIDERATION

coverage.  Factory Mutual's motion must be denied *unless an exclusion applies*.") (emphasis added).  Whether the Contamination Exclusion bars coverage for such losses turns on the text of the Contamination Exclusion itself, not the policy's initial insuring language or the Additional Coverages prefatory language—both of which incorporate by reference the limitations imposed on coverage by the policy's applicable exclusions, rather than instructing how such exclusions should be construed.  As explained below, since the text of the Contamination Exclusion is identical as between the policy in *Out West* and the policy at issue here, there can be no basis to distinguish *Out West* on such grounds.

> C.   **The Order's Construction Of The Contamination Exclusion Is Clear Error And Contrary To Ninth Circuit Law**

As to the Contamination Exclusion, the Order provides:

> The contamination exclusion does not bar coverage for "other physical damage not excluded by this Policy," including viral contamination. As explained above, it is reasonable to read the policy as defining the presence of a "communicable disease" as non-excluded "physical damage," so this exclusion would be no bar to coverage. This interpretation does not nullify the exclusion, as Factory Mutual contends.  Losses caused by other contaminants listed in the Policy's definitions, those that are not "communicable diseases," would remain within the exclusion's scope.  Contamination by foreign substances, impurities, pollutants, hazardous materials, poisons, toxins, mold, and mildew all would be excluded under the plaintiffs' interpretation.

Order at 9.  Respectfully, this holding is clear error and is directly contrary to the Ninth Circuit's construction of this same exclusion in *Out West*.

> ***First***, the Order found FM's proffered interpretation of the exclusion—*i.e.*, that "the additional coverage for communicable diseases acts as an exception to the more general exclusion of losses caused by contaminants," and thus "an insured is limited to the coverage in the communicable disease provisions, and the contamination exclusion bars claims based on other parts of the policy"—to be not the only reasonable interpretation of the exclusion. Order at 9.  That FM's interpretation is the only reasonable one, however, is ***precisely*** what the Ninth Circuit found:

1
2
3
4
5
6
7
8
9
10
11
12

> Out West contends that, given the policy's inclusion of the communicable disease provisions, the contamination exclusion must refer only to "viruses that are not communicable diseases." The policy imposes no such limitation. "An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances." *Julian v. Hartford Underwriters Ins. Co.*, 110 P.3d 903, 910 (Cal. 2005). That is precisely the case here. The communicable disease provisions cover damage caused by the presence of a virus if "access to [the insured property] is limited, restricted or prohibited by: a) An order of an authorized governmental agency regulating or as [a] result of such presence of communicable disease; or b) A decision of an Officer of the Insured as a result of such presence of communicable disease." The contamination exclusion bars coverage under the direct physical loss or damage provisions for damage caused by the presence of a virus. There is thus no conflict between the contamination exclusion, on the one hand, and the communicable disease provisions, on the other, such that the contamination exclusion must be read to refer only to viruses that are not communicable diseases.

13   *Out West*, 2022 WL 4007998, at \*2. *Out West* affirmed dismissal on this basis, meaning

14   that, as a matter of law, this is the only reasonable construction of this exclusion. This central

15   and fundamental conflict between the Order and *Out West*, in and of itself, is grounds for

16   reconsideration.

17   ⠀⠀⠀⠀***Second***, the Order's construction of the Contamination Exclusion is clear error

18   because its construction of the exception to the exclusion (also in the policy construed in *Out*

19   *West*) is contrary to the plain text of that provision. The Order states "[t]he contamination

20   exclusion does not bar coverage for 'other physical damage not excluded by this Policy,'

21   including viral contamination." Order at 9. But the exception to the exclusion actually

22   provides: "***If*** contamination due only to the actual not suspected presence of contaminant(s)

23   ***directly results*** from ***other*** physical damage not excluded by this Policy, ***then*** only physical

24   damage caused by such contamination may be insured." Compl., Ex. A, ECF No. 1-1 at 19

25   (emphases added). The exception thus requires (i) physical damage from an insured risk,

26   (ii) resulting in the presence of contaminants, (iii) which presence causes further physical

27   damage. In that circumstance, the further physical damage caused by the presence of a

28   contaminant would be insured notwithstanding the exclusion. That is not applicable here:

viral contamination from COVID-19 is not alleged to be a "direct result" of "*other* physical damage" to Plaintiffs' property, and the Order does not suggest otherwise. As the Sixth Circuit reasoned in affirming dismissal based on an identical exclusion: "The policy excludes coverage of contamination and any cost from contamination, unless directly resulting from other covered physical damage. [Plaintiff's] claims are exclusively based on damage and loss related to COVID-19, not other physical damage. Therefore, the contamination of COVID-19 on [Plaintiff's] property is excluded." *Dana*, 2022 WL 2452381, at *3.

The discussion of this same argument in *Mashantucket Pequot Tribal Nation v. Factory Mut. Ins. Co.*, No. CV216140378S2021, 2021 WL 4477089 (Conn. Super. Aug. 18, 2021), a case involving this same FM policy form, is also instructive. As the court there explained:

> There are kinds of contamination that might be covered by virtue of this language. One kind of contamination that might result from other physical damage not excluded by the policy could be mold that is the product of water damage from a burst pipe. Mold is defined on page 66 as contamination, but page 10 of the policy suggests that mold damage caused by water flowing from a burst piping system might be covered. If so, water damage from a burst pipe causing mold contamination would be other physical damage not excluded. The other physical damage is damage to the pipe. In that case the physical damage isn't the mold. The mold is merely something that has to be cleaned up because of the damage to the pipe.

> But [plaintiffs] don't have a pipe to point to. They can't escape the fact that their damage was directly caused by the virus, not some other covered cause like a broken pipe.

*Id.* at *2. The Order simply does not account for the fact that the exception to the exclusion unambiguously requires "*other* physical damage" that *causes* the presence of contaminants that then cause *further* damage. The presence of COVID-19 cannot logically be both the "other physical damage" *and* the resulting "contaminants." *See id.* ("By definition, damage from the virus cannot be 'directly resulting from other physical damage not excluded by this Policy.'").

***Third***, the Order's interpretation of the exclusion is contrary to binding California law, as well as *Out West*. The Order adopted an interpretation of the exclusion that rewrites

the exclusion to omit the terms "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent," reasoning that this "does not nullify the exclusion" because "[l]osses caused by other contaminants listed in the Policy's definitions, those that are not 'communicable diseases,' would remain within the exclusion's scope." Order at 8–9. In other words, "[c]ontamination by foreign substances, impurities, pollutants, hazardous materials, poisons, toxins, mold, and mildew all would be excluded under the plaintiffs' interpretation." *Id.* at 9. Based on this, the Order found that "both the insured and insurer [had] propose[d] reasonable interpretations" of the exclusion. *Id.*

This is clear error because under California law, courts "must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage." *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 49 (2010). Plaintiffs' interpretation, found "reasonable" in the Order, renders ***twelve*** words of the exclusion's definitional provision surplusage ("pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent"). The fact that it preserves eight other words ("foreign substance, impurity, pollutant, hazardous material, poison, toxin") and thus does not nullify the exclusion *in its entirety* does not make it a reasonable construction. *See, e.g.*, *Davis v. Farmers Ins. Grp.*, 134 Cal. App. 4th 100, 107 (2005) (where policy covered both property damage and bodily injury "the plain meaning of the exclusion" was not "reasonably susceptible to the [insured's] interpretation because it renders the exclusion meaningless as to claims against an insured for property damage").

And, again, the Ninth Circuit has precisely spoken to this: "There is thus ***no conflict*** between the contamination exclusion, on the one hand, and the communicable disease provisions, on the other, ***such that the contamination exclusion must be read to refer only to viruses that are not communicable diseases***." *Out West*, 2022 WL 4007998, at *2 (emphasis added).

1

**D.** **Reconsideration Is Also Warranted Because The Order Is Contrary To The Great Weight Of Authority**

2

3    In addition to the direct conflict with *Out West*, the Order conflicts with the great

4 majority of courts nationwide to have considered COVID-19 coverage claims brought

5 against FM under the same policy form and dismissed those claims on the pleadings.  *See*

6 *Mars, Inc. v. Factory Mut. Ins. Co.*, No. 1:22-cv-00626-PTG, ECF No. 32 (E.D.Va. Oct. 6,

7 2022) (Ex. 1); *George Washington Univ. v. Factory Mut. Ins. Co.*, No. 21-CV-3006, ---

8 F.Supp.3d ----, 2022 WL 4078942 (D.D.C. Sept. 6, 2022); *Froedtert Health Inc. v. Factory*

9 *Mut. Ins. Co.*, No. 21-CV-0713-BHL, --- F.Supp.3d ----, 2022 WL 3213270 (E.D. Wis. Aug.

10 9, 2022); *San Jose Sharks LLC v. Factory Mut. Ins. Co.*, No. 21-CV-383780, 2022 WL

11 3965662 (Cal. Super. Aug. 8, 2022); *Tumi, Inc. v. Factory Mut. Ins. Co.*, No. 21-CV-02752,

12 2022 WL 2666950 (D.N.J. July 11, 2022); *Oakland Athletics Baseball Co. v. AIG Specialty*

13 *Ins. Co.*, No. RG20079003, 2022 WL 2526929 (Cal. Super. June 20, 2022); *Mohegan Tribal*

14 *Gaming Auth. v. Factory Mut. Ins. Co.*, No. HHD-CV-21-6147037-S, 2022 WL 2303841

15 (Conn. Super. June 8, 2022); *ITT Inc. v. Factory Mut. Ins. Co.*, No. 3:21CV00156, 2022 WL

16 1471245 (D. Conn. May 10, 2022); *Stant USA Corp. v. Factory Mut. Ins. Co.*, No. 1:21-cv-

17 00253-SEB-TAB, 2022 WL 326493 (S.D. Ind. Feb. 3, 2022); *Rockhurst Univ. v. Factory*

18 *Mut. Ins. Co.*, 582 F. Supp. 3d 633 (W.D. Mo. 2022); *Madison Square Garden Sports Corp.*

19 *v. Factory Mut. Ins. Co.*, No. 651521/21, 2022 WL 845245 (N.Y. Sup. Jan. 11, 2022);

20 *Shakopee Mdewakanton Sioux Comm. v. Factory Mut. Ins. Co.*, No. 70-CV-21-6480, 2021

21 WL 6328369 (Minn. Dist. Ct. Dec. 29, 2021); *Zebra Techs. Corp. v. Factory Mut. Ins. Co.*,

22 No. 20-cv-05147, 2021 WL 4459532 (N.D. Ill. Sept. 29, 2021); *Mashantucket*, 2021 WL

23 4477089; *Ralph Lauren Corp. v. Factory Mut. Ins. Co.*, No. 20-CV-10167, 2021 WL

24 1904739 (D.N.J. May 12, 2021).  Many others have dismissed such claims brought under

25 the materially similar policy form issued by FM's affiliate AFM.[2]  The Order is a distinct

26 outlier in reaching a contrary result.

27

28
---
[2] *See Out West*, 2022 WL 4007998; *Cordish Cos. v. Affiliated FM Ins. Co.*, 573 F. Supp. 3d 977 (D. Md. 2021), *aff'd*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022); *Broad Wall Mgmt. Corp. v. Affiliated FM Ins. Co.*, No. 21-CV-10247 (PAE), 2022 WL 3030315

DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MOTION FOR RECONSIDERATION

Among these decisions are several in which courts have rejected the same arguments adopted by the Order.  For instance, in *Froedtert Health*, an insured plaintiff contended that the same prefatory language in a FM policy demonstrated that "communicable disease must cause insured physical loss or damage under the policy."  2022 WL 3213270, at *4.  Reading the policy as a whole, that court held that the "cited prefatory language, without more, [could] not plausibly" support such an interpretation because "[t]he Communicable Disease Response provision does not refer to physical loss or damage at all, let alone state that communicable disease causes physical loss or damage," and "it would be difficult to reconcile the expansive available coverage with the provision's $1 million sublimit or . . . the Policy's contamination exclusion."  *Id.*  Likewise, in *Mohegan Tribal Gaming*, the court held that interpreting the prefatory language to classify communicable disease as "insured physical loss or damage" "would result in a distortion of the Policy to discern a meaning of 'communicable disease' other than that evidently intended by the parties."  2022 WL 2303841, at *5.  Among other things, the court reasoned that "the plain language following the phrase 'Additional Coverages for insured physical loss of damage' modifies the prefatory language by alerting the reader that the meaning of the 'Additional Coverages' is dependent on the language of the following Policy provisions."  *Id.*

Similarly, in *ITT*, the plaintiff argued that "communicable disease <u>must</u> constitute physical loss or damage under the Policy" based on prefatory language (there, in the policy's Time Element section).  2022 WL 1471245, at *9.  The court rejected this argument,

---

(S.D.N.Y. Aug. 1, 2022); *Creative Artists Agency, Ltd. Liab. Co. v. Affiliated FM Ins. Co.*, No. 2:21-CV-08314-AB, 2022 WL 3097371 (C.D. Cal. July 27, 2022); *Jordache Enters. v. Affiliated FM Ins. Co.*, No. 21-CV-5433 (RA), 2022 WL 986109 (S.D.N.Y. Mar. 31, 2022); *Josephson, LLC v. Affiliated FM Ins. Co.*, No. PC-2021-03708, 2022 WL 999134 (R.I.Super. Mar. 29, 2022); *AU Health Sys. v. Affiliated FM Ins. Co.*, No. CV 121-019, 2022 WL 801513 (S.D. Ga. Mar. 15, 2022); *MGA Ent., Inc. v. Affiliated FM Ins. Co.*, No. CV-20-10499-MWF (JPRX), 2021 WL 2840456 (C.D. Cal. July 2, 2021); *Islands Rests., Ltd. P'ship v. Affiliated FM Ins. Co.*, 532 F. Supp. 3d 948 (S.D. Cal. 2021); *St. George Hotel Assocs., LLC v. Affiliated FM Ins. Co.*, 577 F. Supp. 3d 135 (E.D.N.Y. 2021); *Monarch Casino & Resort, Inc. v. Affiliated FM Ins. Co.*, No. 20-CV-1470, 2021 WL 4260785 (D. Colo. Sept. 17, 2021); *Nguyen v. Travelers Cas. Ins. Co. of Am.*, 541 F. Supp. 3d 1200 (W.D. Wash. 2021); *Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co.*, No. 8:20-CV-701, 2021 WL 1419782 (N.D.N.Y. Apr. 15, 2021).

DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MOTION FOR RECONSIDERATION

explaining that the communicable disease coverage provision, by its terms, "is silent as it pertains to a physical loss or damage requirement," whereas numerous other coverage extensions "require physical loss or damage to invoke the right to coverage," and "[s]uch language would be superfluous if every extension definitionally and in every situation constituted physical loss or damage." *Id.* at *9. Thus, general or introductory policy language regarding "physical loss or damage," the court concluded, "does not mean that the mere presence of a communicable disease at a property amounts to physical loss or damage to that property." *Id.*[3] Likewise, the plaintiff in *Stant USA* argued "that coverage for communicable disease in the Policy's additional coverage section reflects FM's acknowledgement that COVID-19 causes physical loss or damage." 2022 WL 326493, at *7. The court disagreed, finding that "the Communicable Disease coverage applies only when the disease is present, distinguishing it from" other provisions that specifically "require physical loss or damage." *Id.*

Courts across the country thus recognize that the FM policy form's communicable disease coverages contain their own unique requirements for coverage and—unlike other "additional coverages" or "coverage extensions" set forth in that policy form—do not, by their own terms, require "physical loss or damage." *See San Jose Sharks*, 2022 WL 3965662, at *3, *8–9 (dismissing claims against FM requiring "physical loss or damage" and permitting only claims under communicable disease coverages to proceed); *Oakland Athletics*, 2022 WL 2526929, at *1, *3 (finding "Communicable Disease . . . coverages do not require physical loss or damage to property" and dismissing claims against FM requiring "physical loss or damage"); *Tumi*, 2022 WL 2666950, at *7, *11 (finding "[t]he two communicable-disease provisions . . . do not require 'physical loss or damage'" and granting

---

[3] The *ITT* ruling discussed above dismissed ITT's amended complaint. In dismissing the original complaint, the district court, ruling from the bench, also specifically rejected the argument that where a coverage is "included among additional coverages, it necessarily constitutes physical loss or damage," as that would illogically define coverages such as "accounts receivable or coinsurance deficiency or currency devaluation" as "other examples of physical loss or damage." *ITT, Inc. v. Factory Mut. Ins. Co.,* No. 3:21-cv-00156-SRU, ECF No. 56, Hr'g Tr. at 43:4–44:8 (D. Conn. Aug. 3, 2021) (Ex. 2).

1   FM's motion for judgment on the pleadings).[4]   So, too have courts faced with similar

2   arguments under the AFM policy form.[5]

3          The same is true as to the Contamination Exclusion.   Courts faced with policies

4   containing both limited "communicable disease" coverages and generally-applicable virus

5   exclusions have consistently concluded that the only coverage for COVID-19-related losses

6   is to be found under the communicable disease provisions.   *See, e.g.*, *Salon XL Color &*

7   *Design Grp., LLC v. W. Bend Mut. Ins. Co.*, 517 F. Supp. 3d 725, 730 (E.D. Mich. 2021)

8   (rejecting argument that "[a] special grant of coverage for communicable diseases followed

9   by an exclusion for virus or bacteria cannot plausibly exist in the same policy");

10  *Mashantucket*, 2021 WL 4477089, at *2–3 (rejecting attempt "to establish virus coverage

11  for claims outside of the dollar-limited communicable disease coverage" and finding "no

12  coverage for the virus beyond the two [Communicable Disease] exceptions. This result is so

13  unavoidable, that it is the only rational way to read the policy."); *Ralph Lauren*, 2021 WL

14  1904739, at *4 n.8 (Plaintiffs' "interpretation of what constitutes a 'virus' would eviscerate

15  the undisputed fact that 'SARS-CoV-2 is a virus that causes the COVID-19 disease.'");

16  *Monarch Casino*, 2021 WL 4260785, at *4 (the Communicable Disease provisions "simply

17  carve out narrow circumstances where coverage is permitted").

18

---

19  [4] *See also Ralph Lauren*, 2021 WL 1904739, at *7 (finding communicable disease provisions
20  did not require showing of "physical loss or damage" and holding the presence of the virus
    did not trigger coverage under the policy); *Rockhurst Univ.*, 582 F. Supp. 3d at 640 (finding
21  "[t]he communicable disease provisions are not subject to a physical loss requirement nor to
    the [C]ontamination [E]xclusion" and granting FM's motion for judgment on the pleadings);
22  *Zebra Techs.*, 2021 WL 4459532, at *8 (holding that the presence of COVID-19 "does not
    cause physical loss or damage" and granting FM's motion for judgment on the pleadings).

23  [5] *See, e.g.*, *Josephson,* 2022 WL 999134, at *5 (rejecting argument that the AFM policy
24  "'expressly designates communicable disease at, and limitations to access, of property' as
    types of 'physical loss or damage'" due to the coverage being entitled "Communicable
25  Disease - Property Damage"); *AU Health Sys.*, 2022 WL 801513, at *7 n.3 ("There is a
    provision in the Policy titled 'Communicable Disease - Property Damage'. . . . Plaintiffs
26  argue that this provision shows that COVID-19 constitutes property damage; however, the
    Court is not convinced by this argument because this provision does not have the same
27  requirement of 'physical loss or damage' as other provisions in the Policy. If the drafters
    intended for this 'property damage' to satisfy the requirements of other provisions, they
28  would have defined them the same way.").

1  In sum, coupled with the Order's clear conflict with California law and the Ninth

2  Circuit's decision in *Out West*, this weight of authority strongly indicates that the Order

3  constitutes clear error that would work a manifest injustice on FM if allowed to stand.  Thus,

4  while FM recognizes that reconsideration is granted sparingly, FM respectfully submits that

5  reconsideration is appropriate here.

6  ## II.   IN THE ALTERNATIVE, THIS COURT SHOULD CERTIFY AN IMMEDIATE APPEAL UNDER SECTION 28 U.S.C. § 1292(b)

7

8  If this Court does not grant FM's Motion for Reconsideration, then, in the alternative,

9  FM respectfully requests the Court certify an immediate appeal to the Ninth Circuit.  Section

10  1292(b) authorizes a district court to certify an interlocutory appeal if the order "[1] involves

11  a controlling question of law [2] as to which there is substantial ground for difference of

12  opinion, and [3] an immediate appeal from the order may materially advance the ultimate

13  termination of the litigation."  *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)

14  (quoting 28 U.S.C. § 1292(b)).  The Order meets all three statutory requirements and FM

15  requests the Court amend its Order to include the certification necessary for interlocutory

16  appeal.  *See* Fed. R. App. P. 5(a)(3) ("If a party cannot petition for appeal unless the district

17  court first enters an order granting permission to do so or stating that the necessary conditions

18  are met, the district court may amend its order, either on its own or in response to a party's

19  motion, to include the required permission or statement.").

20  ### A.   The Court's Order Presents A Controlling Question Of Law

21  The Court's Order denying FM's Motion to Dismiss decided a controlling question

22  of law.  A question of law is "controlling" if resolving it on appeal "could materially affect

23  the outcome of litigation in the district court."  *In re Cement Antitrust Litig.*, 673 F.2d 1020,

24  1026 (9th Cir. 1982).  Courts in this Circuit have held that if "the reversal of the district

25  court's order would terminate the action," the question is "controlling."  *VIA Techs., Inc. v.

26  SonicBlue Claims, LLC*, No. C 09-2109 PJH, 2011 WL 2437425, at *1 (N.D. Cal. June 17,

27  2011) (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990)).  There

28  can be no question that this precondition is satisfied here.

1

2

### B.   A Substantial Ground For Difference Of Opinion Exists Regarding Whether The COVID-19 Virus Causes Physical Loss Or Damage To Property Under The FM Policy

3          In light of the conflict between this Court's October 28 Order and the Ninth Circuit's

4    decision in *Out West*, as well as the numerous decisions nationwide and in California

5    dismissing similar COVID-19 coverage claims against FM, and other insurers using similar

6    policy forms, it is evident that a substantial ground for difference of opinion exists as to

7    whether the Order's construction of the policy language at issue is correct.   Generally,

8    substantial grounds for difference of opinion exist when the disputed issue is one "over which

9    reasonable judges might differ," or where "uncertainty provides a credible basis for a

10   difference of opinion on the issue."  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681,

11   687–88 (9th Cir. 2011) (quoting *In re Cement*, 673 F.2d at 1028).   "[I]dentification of a

12   sufficient number of conflicting and contradictory opinions *would* provide substantial

13   ground for disagreement." *Couch*, 611 F.3d at 634 (quoting *Union Cty. v. Piper Jaffray &*

14   *Co.*, 525 F.3d 643, 647 (8th Cir. 2008) (emphasis added)).   Here, the Order stands against

15   almost all other decisions to have considered the same, or substantially similar questions.

16   These conflicting decisions clearly establish that substantial ground for disagreement exists

17   over the contract interpretation questions at issue here.  The second grounds for certification

18   is thus met here, as well.

19

20

### C.   An Immediate Appeal Will Materially Advance The Ultimate Termination Of The Litigation

21          Finally, certification is appropriate because an appeal may "materially advance the

22   ultimate termination of [this] litigation."  *Reese*, 643 F.3d at 688.  An interlocutory appeal

23   materially advances the ultimate resolution of litigation if it avoids protracted and expensive

24   litigation, *In re Cement*, 673 F.2d at 1026 (citing *U.S. Rubber Co. v. Wright*, 359 F.2d 784,

25   785 (9th Cir. 1966)), or if it helps avoid trial or substantially shortens the time spent in

26   litigation. *Holak v. K Mart Corp.*, No. 1:12-CV-00304-AWI, 2015 WL 4756000, at *1 (E.D.

27   Cal. Aug. 11, 2015) (citing *Conte v. Jakks Pac., Inc.*, No. 1:12–CV–00304, 2012 WL

28   3069971, at *3 (E.D. Cal. July 27, 2012)).

If the Ninth Circuit rules consistent with its prior ruling in *Out West*, Plaintiffs' claims will be dismissed in their entirety and there will be nothing left for this Court to adjudicate. Even if it rules otherwise, the Ninth Circuit's guidance will provide clarity for the parties and thus increase the likelihood of early termination of this litigation. Efficiency thus weighs strongly in favor of certification.

**D.   If Certification Is Granted, Proceedings Should Be Stayed While The Appeal Is Pending**

The Court has the authority and discretion to stay further proceedings pending the resolution of an interlocutory appeal to "'promote economy of time and effort for itself, for counsel, and for litigants.'" *See Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972) (citations omitted); *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979) (a trial court may "find it efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case"). If this Court declines to grant FM's Motion for Reconsideration and instead grants its Section 1292(b) certification request, FM respectfully requests that the Court also exercise its discretion to enter a stay in this case. *See Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*, No. 2:13-CV-02378, 2014 WL 2624981, at *5 (E.D. Cal. June 11, 2014) (granting motion for Section 1292(b) certification and motion for a stay of proceedings pending resolution of an appeal); *Lakeland Village Homeowners Ass'n v. Great American Ins. Group*, 727 F. Supp. 2d 887, 897 (E.D. Cal. 2010) (same). A stay would promote judicial economy and preserve judicial resources by suspending discovery and obviating the need for the Court to resolve disputes that may be rendered unnecessary by the appeal. It would also allow the parties to avoid expending resources necessary to conduct discovery and prepare for further briefing and trial.

**CONCLUSION**

For the foregoing reasons, FM respectfully requests that the Court grant reconsideration of its October 28, 2022 Order or, in the alternative, amend the Order to include certification of an interlocutory appeal of the controlling question of whether the

19

alleged presence of COVID-19 on insured property may be covered physical loss or damage under the property insurance policy and stay further proceedings before the Court pending resolution of any appellate proceedings.

Dated: November 23, 2022                    Respectfully submitted,

                                            By: */s/ Joyce C. Wang*
                                            JOYCE C. WANG (Bar No. 121139)
                                            LISA L. KIRK (Bar No. 130272)
                                            CARLSON, CALLADINE & PETERSON LLP
                                            353 Sacramento Street, 16th Floor
                                            San Francisco, California 94111
                                            Telephone: (415) 391-3911
                                            Email: jwang@ccplaw.com
                                                      lkirk@ccplaw.com

                                            BRYCE L. FRIEDMAN
                                            (*pro hac vice application pending*)
                                            ISAAC RETHY (*pro hac vice*)
                                            SIMPSON THACHER & BARTLETT LLP
                                            425 Lexington Avenue
                                            New York, New York 10017
                                            Telephone: (212) 455-2000
                                            Email: bfriedman@stblaw.com
                                                      irethy@stblaw.com

                                            *Attorneys for Defendant Factory Mutual*
                                            *Insurance Company*

DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MOTION FOR RECONSIDERATION

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

Mars, Incorporated,                              )
                                                 )
       *Plaintiff*,                          )
                                                 )
   v.                                            )        Case No. 1:22-cv-626 (PTG/JFA)
                                                 )
Factory Mutual Insurance Company, d/b/a FM       )
   Global,                                       )
                                                 )
       *Defendant*.

<u>ORDER</u>

This matter comes before the Court on Defendant's Motion to Dismiss (Dkt. 17) Plaintiff's

Complaint (Dkt. 1).  For the reasons stated in open court, it is hereby

ORDERED that Defendant's Motion to Dismiss (Dkt. 17) is GRANTED.  It is further

ORDERED that Plaintiff's Complaint (Dkt. 1) is DISMISSED.  The portion of Plaintiff's

Complaint relating to the "Communicable Disease Response" and the "Interruption by

Communicable Disease" provisions in the property insurance policy is DISMISSED WITHOUT

PREJUDICE.

Entered this 6th day of October, 2022

                                      /s/
                               Patricia Tolliver Giles
                               United States District Judge

# EXHIBIT 2

```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3     _____
                                      )
 4     ITT INC.,                      )
                                      ) No. 3:21-cv-00156-SRU
 5                   Plaintiff,       )
                                      ) August 3, 2021
 6                                    )
       v.                             ) 11:00 a.m.
 7                                    )
                                      ) 915 Lafayette Boulevard
 8     FACTORY MUTUAL INSURANCE       ) Bridgeport, Connecticut
       COMPANY,                       )
 9                                    )
                     Defendant.       )
10     _____)

11

12

13             VIDEOCONFERENCE MOTION HEARING

14

15

16     B E F O R E:

17          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

18

19

20

21

22

23                 Official Court Reporter:
24                 Melissa J. Cianciullo, RDR, CRR, CRC
                   (203) 606-1794
25                 melissa_cianciullo@ctd.uscourts.gov
```

```
 1   A P P E A R A N C E S:

 2   For the Plaintiff:

 3       MORGAN LEWIS
             One Market
 4           Spear Street Tower
             San Francisco, CA 94105
 5           (415) 442-1000
             Email: Jeffrey.raskin@morganlewis.com
 6       BY:  JEFFREY SCOTT RASKIN, ESQ.

 7       MORGAN LEWIS
             One State Street
 8           Hartford, CT 06103-3178
             (860) 240-2700
 9           Email: Michael.dagostino@morganlewis.com
         BY:  MICHAEL C. D'AGOSTINO, ESQ.
10
         MORGAN LEWIS
11           1111 Pennsylvania Avenue, N.W.
             Washington, DC 20004
12           (202) 739-5521
             Email: Sergio.oehninger@morganlewis.com
13       BY:  SERGIO F. OEHNINGER, ESQ.

14
     For the Defendant:
15
         WINSTON & STRAWN LLP
16           200 Park Avenue
             New York, NY 10166
17           (212) 294-4622
             Email: Klibrera@winston.com
18       BY:  KELLY LIBRERA, ESQ.
             HARVEY KURZWEIL, ESQ.
19           GEORGE MASTORIS, ESQ.

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  We're here in ITT
 2   v. Factory Mutual Insurance Company.
 3              I won't ask for appearances.  I assume they
 4   have been provided to the court reporter; is that
 5   correct?
 6              MS. LIBRERA:  I don't believe we have
 7   provided appearances to the court reporter, your
 8   Honor.
 9              THE COURT:  All right.  Very good.  Then
10   let's get appearances for the record, please.
11              MS. LIBRERA:  On behalf of Factory Mutual
12   Insurance Company, Kelly Librera.  And we me are my
13   partners Harvey Kurzweil and George Mastoris.
14              THE COURT:  Thank you.
15              MR. RASKIN:  Good morning, your Honor.  On
16   behalf of ITT, I am Jeffrey Raskin.  And with me are
17   partners Sergio Oehninger and Mike D'Agostino.
18              THE COURT:  Thank you.
19              All right.  Well, obviously we're here on the
20   motion to dismiss.  I have gone through the papers
21   and looked over the policy.  I think perhaps I'd like
22   to start to see whether we could simplify things a
23   little bit.
24              Is it correct, Mr. Raskin, that the complaint
25   only alleges physical loss or damage as comprising
```

1    the existence of or appearance of COVID-19 at ITT

2    facilities?

3          MR. RASKIN:  It alleges physical loss or

4    damage as a communicable disease not only at ITT

5    properties.  That is for on-site business

6    interruption losses.  But it also alleges claims

7    under the civil authority coverage which is COVID-19

8    within five miles of a covered location, and it also

9    alleges losses at what the policy calls contingent

10   time element locations.  Those are properties owned

11   by suppliers, customers, basically people within the

12   supply chain.  So there's three components to the

13   claim.

14         THE COURT:  All right.  But my point is the

15   claim is dependent upon the determination that

16   COVID-19 presence, wherever the presence may be,

17   constitutes physical loss or damage.  In other

18   words --

19         MR. RASKIN:  Yes.

20         THE COURT:  Okay.

21         MR. RASKIN:  Yeah.  I just wanted to --

22   that's because the complaint was written with the FM

23   policy in mind.  It wasn't written with the more

24   generalized policies written on forms published by

25   the insurance service organization in mind.  The

 1  complaint was written with this policy in mind in

 2  this particular circumstance.

 3       THE COURT:  Okay.  But there's a fairly

 4  generalized allegation in the complaint about ITT

 5  suffered physical loss or damage.

 6       MR. RASKIN:  Correct.

 7       THE COURT:  And I want to be sure that, for

 8  example, you didn't have to knock down a facility and

 9  repair it, you didn't have to burn protective

10  clothing, you didn't have to -- you didn't suffer, in

11  other words, more traditional types of physical loss

12  or damage in addition to or as a result of the

13  COVID-19 exposure.

14       MR. RASKIN:  That's right.  The complaint

15  mentions the presence of COVID-19 at something like

16  20 different covered locations.  And it's just the

17  COVID-19 situation.  There were no, you know, broken

18  roofs or anything like that.  It's COVID-19.

19       THE COURT:  Okay.  All right.  Well, that's

20  helpful.

21       Okay.  Well, let me give -- that was kind of

22  a fundamental thing I wanted to confirm.  That was my

23  understanding, but I wanted to confirm it.  And

24  perhaps I'll give everybody a chance to take up what

25  they'd like to.

```
1              So it's a defense motion.

2         MS. LIBRERA:  Thank you, your Honor.  Kelly

3    Librera, as I mentioned earlier, on behalf of Factory

4    Mutual Insurance Company.

5              Factory Mutual's policy is straightforward as

6    is its motion to dismiss.  And we moved on two

7    primary bases, your Honor.  The first is that

8    consistent with the overwhelming weight of authority

9    both in Connecticut and outside Connecticut,

10   plaintiffs have not and cannot allege that the novel

11   coronavirus causes physical loss or damage.  Case

12   after case underscores that while the virus harms

13   people, it poses no threat to property.

14             Second, even if the plaintiffs could show

15   physical loss or damage, the policy's clear

16   contamination exclusion precludes coronavirus losses

17   except for those losses which fit within two narrow

18   coverage extensions; and the coverage extensions I'm

19   referring to, your Honor, are communicable disease

20   response and interruption by communicable disease.

21             Those two coverage extensions have different

22   triggers than other provisions in the policy.  The

23   triggers for coverage with those provisions are the

24   actual, not suspected, presence of communicable

25   disease at a location where an order or a decision of
```

1  company personnel to shut or limit access to the

2  facility, and there's a temporal component of 48

3  hours. Importantly, these coverages are subject to an

4  aggregate limit of $1 million.

5       ITT has not adequately pleaded its

6  entitlement to communicable disease or interruption

7  by communicable disease either in terms of telling us

8  which places were closed, why they were closed, what

9  the extent of the injury is, where the disease was

10 and how long the places were closed.  And for that

11 reason dismissal is appropriate.

12      THE COURT:  Well, is that something they have

13 to plead, or is that something they have to prove to

14 you in connection with the claim process?

15      MS. LIBRERA:  I think they do have to plead

16 the existence or the triggers for the coverage, your

17 Honor.  It's not enough to just say that there was

18 the preference of communicable disease.  All that is

19 is mimicking the policy language.  And case after

20 case says that what you need are factually based

21 allegations, and we just don't have that here.

22      The keystone of ITT's case, and I think as

23 Mr. Raskin just made clear, and the way that it seeks

24 to distance itself from the mountain of authority to

25 the contrary, is to say that the FM policy is somehow

1  different.  And the way they say it's different is

2  that these two coverage extensions somehow equate

3  communicable disease with physical loss or damage .

4  And directly in their opposition papers, and I'm

5  quoting, they say -- this is document 42 on the

6  docket -- that the FM policy does not require ITT to

7  show tangible harm or physical alteration to recover

8  its losses.

9       So, essentially, their case is that due to

10 the FM policy language and two coverage extensions

11 which have different triggers than the other

12 coverages in the policy, they are then entitled to

13 $750 million for the presence of lower case

14 communicable disease.

15      Now, starting with the contamination

16 exclusion which is on page 7 of the policy which is

17 attached as Exhibit A to plaintiff's complaint, on

18 page 17, the contamination exclusion appears, and

19 what that says is that the policy excludes

20 contamination and any costs due to contamination,

21 including the inability to use or occupy property or

22 any cost of making property safe or suitable for use

23 or occupancy.  That's on page 17, as I mentioned.

24      Now, as you'll see in the policy, there's a

25 bolded term there's.  It's contamination.  So we go

1    to the definitions of the policy, and that's on page

2    70 -- excuse me, 74.  And there you find the

3    definition of contaminate which is anything that

4    causes contamination.  Contamination is any condition

5    of property due to the actual or suspected presence

6    of any foreign substance, impurity, pathogen,

7    hazardous material, poison, toxin, pathogen or

8    pathogenic organism, bacteria, virus, disease-causing

9    or illness-causing agent, fungus, mold or mildew.

10          ITT wants to carve out from this exclusion

11   any virus brought on to the premises by a person with

12   coronavirus disease.  That's Paragraph 98 of their

13   complaint.  This is untenable.  The virus and the

14   disease are one and the same.  And we can tell that

15   from plaintiff's complaint because each time they

16   talk about COVID-19 and they cite back to CDC

17   guidance, every single time when they're talking

18   about the discharge of a person with COVID-19, that's

19   the virus.  But ITT doesn't say that in their papers.

20   They just talk about discharges.  But what is the

21   discharge if it's not for the virus?

22          Plaintiff in the *Ralph Lauren* case, which was

23   out of the district of New Jersey -- we submitted

24   this to your Honor as supplemental authority -- made

25   the identical argument on a nearly identical Factory

1   Mutual policy.  And Judge Wigenton held, and I'm

2   reading, that plaintiff's interpretation of what

3   constitutes a virus would eviscerate the undisputed

4   fact that SARS-CoV-2 is a virus that causes the

5   COVID-19 disease.  That's at page 7 of her opinion,

6   footnote 8.

7          With respect to physical loss or damage,

8   there is no support in the policy for the notion that

9   lower case communicable disease is per se property

10  loss or damage.  And that's ITT's entire argument.

11  Nowhere in the 80-page policy does the policy say

12  that communicable disease equates to property loss or

13  damage and with good reason.  It's nonsensical to

14  claim that a person who is carrying the COVID-19

15  disease who is suffering from the COVID-19 disease

16  causes property, physical property loss or physical

17  property damage everywhere they go.

18         The premise of ITT's argument, moreover, is

19  that every single coverage in the policy requires

20  physical loss or damage.  And as cited in our brief,

21  that's simply not the case.  There are several

22  property damage coverages in the policy that have

23  different triggers; in other words, not physical loss

24  or damage.  And the same thing is true of several

25  business interruption coverages.  Nor is it unusual

1    for a property policy to have certain coverages in

2    the policy that have triggers that are not physical

3    loss or damage.

4          We submitted yesterday a recent opinion out

5    of the Southern District of New York by Judge Rakoff

6    in the *Northwell* case, and as your Honor will see, in

7    that particular case, there is a coverage there that

8    has a trigger that is not physical loss or damage.

9          Several of the other cases we've cited in our

10   papers, including *Mohawk* and *Outwest*, have the same

11   thing.  There is no physical loss or damage trigger

12   for certain coverages, usually additional coverages

13   or coverage enhancements similar to communicable

14   disease response and interruption by communicable

15   disease.

16         Another reason why ITT's argument fails is

17   that it conflates cause and effect.  The policy

18   covers fortuitous causes of loss such as fires or

19   hurricanes.  When those risks cause harm to property,

20   the coverage comes into play.  By claiming that

21   communicable disease itself is physical loss or

22   damage, ITT is conflating cause and effect.

23         Despite ITT's assertion, for example, at page

24   20 of its brief that a weather event is a, quote,

25   classic instance of physical loss or damage, the mere

1    happening of a weather event is not physical loss or

2    damage.  If a hurricane comes through my street,

3    doesn't do a thing to my house, destroys my

4    neighbor's house, I don't think anyone on this call

5    would contend that I have an insurance claim.  But by

6    plaintiff's logic, I would, because the mere

7    existence of a weather event is physical loss or

8    damage.

9         To sum up, your Honor, very simply, the

10   policy grants coverage, exclusions like the

11   contamination exclusion takes coverage away.  The

12   extensions give back coverage that's been taken back

13   by those exclusions, and is that's exactly what we

14   have here.  The extensions do not, despite ITT's best

15   efforts and pleading, determine the scope or expand

16   the scope of the underlying policy.

17        THE COURT:  So you seem to be open to the

18   idea that there's coverage under the communicable

19   disease provisions of the policy.

20        MS. LIBRERA:  Correct.  If ITT can show the

21   triggers for communicable disease, which is actual

22   presence of the disease, a closure order that lasts

23   48 hours, we are certainly open to adjusting the

24   claim.  We've requested the information.  It's not

25   adequately pled.  But should it be adequately

1    substantiated, FM Global would pay the coverage under

2    the policy for interruption by communicable disease

3    and also communicable disease response.

4           THE COURT:  All right.  Very good.

5    Mr. Raskin, do you want to respond?

6           MR. RASKIN:  Yes.  I think we actually need

7    to take a step back.

8           FM's brief, its motion, cites the rules of

9    contract interpretation, and those rules are pretty

10   much accepted all over the country.  There's some

11   differences in some jurisdictions, but the basic

12   rules are the same.  You know, they cite the rules

13   but they don't actually apply them.

14          One of the most fundamental rulings of

15   contract interpretation is that we read contracts and

16   provisions in context.  All of the provisions give

17   meaning to all of the other provisions.  We don't

18   just pluck out a term or a provision and say, aha,

19   this is what it means.  That, however, is what is

20   going on with their discussion of these communicable

21   disease provisions in the policy.

22          Their position basically is because those

23   provisions do not cite the words or recite the words

24   physical loss or damage, that FM provides those

25   coverages in the absence of the insured proving any

1   physical loss or damage.  A problem with that

2   argument is that all of the coverage provisions in

3   these policies are subordinate to the basic insuring

4   agreement.

5        So the basic insuring agreement, if you look

6   at document 2-1, that's our complaint, and that

7   document is the policy itself.  It's on ECF page 9.

8   It's real simple.  The policy covers property against

9   all risks of physical loss or damage.  That is the

10  animating provision for all of the coverages provided

11  under the policy.  If there is no physical loss or

12  damage, there is no coverage afforded under the

13  policy.

14       Now, if --

15       THE COURT:  So if the coronavirus is not --

16  does not constitute physical loss or damage, there is

17  no claim whatsoever, even under the communicable

18  disease provisions?

19       MR. RASKIN:  No.  Communicable disease at

20  property, if shown to exist, those provisions talk

21  about the actual or -- the actual, not suspected,

22  presence of communicable disease at property.  If

23  communicable disease at property is shown to exist,

24  then the coverage is afforded to the extent that the

25  losses are whatever they are.

1          So this policy is different than all of the

2     other policies out there.  This policy has provided

3     this coverage under a policy where all of its

4     animating features flow from the existence of

5     physical loss or damage at a property.  That's the

6     basic insuring agreement.  Everything flows from

7     that.

8          So the argument simply that these provisions

9     themselves do not recite those terms doesn't matter

10    because everything is dependent upon physical loss or

11    damage.

12         There was a statement made in a presentation

13    that we focused on a weather event in our brief and

14    we supposedly said that a weather event was a

15    paradigmatic example of physical loss or damage.

16    That's actually not what we said.  We said that a

17    weather event was a paradigmatic accidental event

18    because the provision they were talking about was a

19    provision for coverage for interruption of electrical

20    service.  So that particular provision includes an

21    additional requirement that if there's a -- if you

22    suffered losses because there was an interruption of

23    electrical service, it has to be as a result of an

24    accidental event.  A service provider may, for

25    example, shut down electricity because there's wild

 1   fires in the area.  That's not an accidental event.

 2   If you want that particular coverage, there's just

 3   another requirement.  That's what we were pointing

 4   out.  So the mischaracterization of our brief is

 5   unfortunate.

 6          So if you look at their policy, their policy

 7   considers communicable disease at property to be

 8   physical loss or damage.  That's how they wrote this.

 9   So --

10          THE COURT:  Where would I find that language

11   in the policy, the definition of communicable disease

12   as physical loss or damage?

13          MR. RASKIN:  Well, communicable disease is

14   defined in the policy as being disease that is

15   transmissible from human to human by direct or

16   indirect contact with an infected individual or the

17   individual's discharge.  That's how it's defining

18   communicable disease.  The policy's consideration of

19   that to be physical loss or damage is based upon the

20   insuring agreement which covers --

21          THE COURT:  You're breaking up a little bit.

22   I'm sorry.  It's based upon what?

23          MR. RASKIN:  It's based upon what's in the

24   insuring agreement.  The insuring agreement requires

25   physical loss or damage.  When there is physical loss

1   or damage, it provides a bunch of different coverages

2   that may or may not be applicable in any particular

3   situation.  That is the capstone of the policy.

4   Everything flows from that.  If you consider the

5   policy to be a triangle, the insuring agreement is at

6   the top, and then everything flows from that.  So

7   without physical loss or damage, there's no coverage

8   period for any of the provisions in the policy.

9        Some of the provisions require additional --

10   have additional requirements like the requirement of

11   an accidental event for interruption by --

12   interruption of incoming electrical service.

13        So once you have physical loss or damage,

14   then you look at the policy and see what parts of the

15   policy are applicable to your claim and what you can

16   prove.  So this policy would not provide coverage for

17   something that is not based on physical loss or

18   damage as happening and proven by the insured.

19        Now, we cited --

20        THE COURT:  So just to be clear, if I were to

21   hold that the policy does not cover COVID-19, you're

22   waiving a claim for coverage under the communicable

23   diseases provisions?

24        MR. RASKIN:  No.

25        THE COURT:  In other words, if COVID is not

1  physical loss or damage, you're saying you have no

2  coverage under communicable disease?

3          MR. RASKIN:  No.

4          THE COURT:  No?

5          MR. RASKIN:  We're not saying that.  No,

6  we're not saying that.  And, I mean, I was going to

7  talk about this later.  But the idea that as a matter

8  of law COVID is or is not physical loss or damage is

9  kind of an odd statement on a motion to dismiss

10  because that's a question of evidence.  It's a

11  question of science.  It's not a question of law.

12          THE COURT:  Well, it's a question of pleading

13  at this point.  In other words, you haven't pled, and

14  I think you earlier admitted, that other than the

15  presence of COVID-19, there has been no physical

16  losses or damage; that is, you didn't burn HAZMAT

17  suits, you didn't knock down a wing of the facility,

18  anything like that, right?

19          MR. RASKIN:  That's right.  ITT did not have

20  any of that.  But as I said, we wrote this complaint

21  with this policy in mind.  There is scientific

22  evidence out there that talks about COVID-19 actually

23  causing a physical transformation of property.  We

24  didn't plead that in this case because we have a

25  different policy.

```
1              THE COURT:  Well, okay.  But the point is
2    don't you have to plead that you did in fact suffer
3    physical loss or damage?  And I understand you
4    attempted to do that with respect to COVID.  But that
5    just makes my point.  If COVID is not physical loss
6    or damage and you haven't pled any other physical
7    loss or damage, then are you taking the position
8    there is no -- are you acknowledging there is no
9    coverage under the policy?
10             MR. RASKIN:  No, I'm not -- we're not
11   acknowledging that.  I mean, first of all, I mean, we
12   don't think that the question of whether COVID-19
13   causes physical loss or damage or causes physical
14   transformation of property is something that's
15   amenable on a motion to dismiss.  And I know that
16   lots of trial courts have reached that conclusion.
17   But that's really a question of evidence.
18             THE COURT:  Well, okay.  Right now we have a
19   virus that you've alleged is present.
20             MR. RASKIN:  We allege that communicable
21   disease is present.
22             THE COURT:  Fair enough.  What physical loss
23   or damage to the property of ITT resulted from that
24   circumstance?
25             MR. RASKIN:  The complaint says that ITT has
```

1    incurred its own cost of cleaning up its property and

2    dealing with the results of having COVID-19 on 20

3    different premises.  That's in the complaint.  That

4    is discussed in the complaint with respect to ITT

5    itself.

6         THE COURT:  Okay.  And cleaning, let's take

7    cleaning as an example.  So if you have to clean

8    something, maybe there's physical loss or damage if

9    you're cleaning up after a flood or a hurricane.  But

10   if you're cleaning your offices, I don't think

11   anybody would say that that constitutes physical loss

12   or damage.  And so I think it may be incumbent upon

13   you to say that you suffered the former type of

14   cleaning loss, not the latter type of the cleaning

15   loss.

16        MR. RASKIN:  Well, at Paragraph 29-A, ITT

17   says that it had to remediate and dispose adversely

18   affected property at its locations, at its covered

19   locations.

20        There is also a -- you know, the discussion

21   of that ends up coming later in the complaint toward

22   the end.  But there's a discussion of the 20 separate

23   locations, including the corporate headquarters and

24   locations in various different countries, where that

25   has happened.  It's actually in the complaint.

```
 1              THE COURT:  Okay.  So, for example, in
 2    Paragraph 29-B, you say, "When disease outbreaks
 3    occur at a facility, a common and necessary response
 4    is to shut down the facility and undertake remedial
 5    efforts."
 6              You don't say, ITT had to shut down its San
 7    Clemente facility and remediate.  You don't say it
 8    has to shut down its White Plains facility and
 9    remediate.  You don't describe the form of
10    remediation.  You know, this is -- this is
11    hypothetical pleading.
12              MR. RASKIN:  Your Honor, there is more in it.
13    Hold on.  I'm writing down paragraph numbers.
14              Later in the complaint there's more
15    discussion of this.
16              THE COURT:  Well, take a look at 68 through
17    71.  That, I think, is as close as you come.
18              MR. RASKIN:  And there's more, I think.  I
19    mean, there is a statement about 20 locations and it
20    says where they're at.
21              THE COURT:  Yeah.  That was -- I saw that in
22    the statement of loss.
23              MR. RASKIN:  Right.  The statement of loss is
24    actually appended to the complaint and incorporated
25    in full.
```

```
 1              THE COURT:  Right.
 2              MR. RASKIN:  So, I mean, that's -- it's in
 3    there then, and that's a discussion of what happened
 4    that was proof of loss that was submitted when they
 5    made the claim.  So it's all incorporated into the
 6    complaint.
 7              Now, the question always in pleading is do
 8    you write the trial brief or do you write a pleading
 9    that's based on what's required to file a pleading in
10    federal court.  So, I mean, there's obviously a lot
11    of differentiation between what's the basic pleading
12    requirements and what you would come in to prove your
13    case.
14              THE COURT:  Okay.  You know, way back at the
15    beginning I asked you whether you -- well, maybe I
16    didn't make it clear enough.
17              Are there allegations that you are presently
18    able to make that give some meat to what I see as
19    kind of conclusory or hypothetical allegations?
20              MR. RASKIN:  Hypothetical allegations about
21    COVID and damage at ITT properties?
22              THE COURT:  Right.
23              MR. RASKIN:  Yes.  Yes.  It would be a
24    furtherance of what's in the attached proof of loss.
25              THE COURT:  Okay.  Again, I read the proof of
```

```
 1    loss and didn't come away with an understanding of
 2    what happened in South America or what happened in
 3    California.
 4            MR. RASKIN:  Right.  And, I mean, that can be
 5    elucidated.  We can write a longer complaint.
 6    Ultimately, we would have to come in and prove that
 7    anyway.  So if FM wants us to prove our case in a
 8    complaint, then maybe that's what we'll need to do.
 9    But ultimately we have to prove it anyway, so we can
10    do it now just as easily as doing it later.
11            THE COURT:  Well, I'm not asking for proof.
12    I'm asking for allegations that are provable.
13            MR. RASKIN:  Right.  It would go off of
14    what's in the proof of loss and bring up to the
15    current time period.  That proof of loss, I think,
16    was submitted -- it was more than a year ago.  So
17    things have happened since then, undoubtedly.
18            THE COURT:  Okay.
19            MS. LIBRERA:  Your Honor, may I make a
20    statement?
21            MR. RASKIN:  No.  I'm not done yet.  I'm
22    going to move to the next point.
23            Subsequent to the filing of our opposition,
24    Judge Amos Mazzant in the Eastern District of Texas
25    issued a decision in the *Cinemark* case.  Now, the
```

1   decision we submitted as just a supplemental

2   authority and didn't discuss it other than this was

3   issued.  But if you take a look at that decision and

4   you also go back to an earlier decision by the same

5   judge, he's probably maybe the only judge in the

6   country that has considered these issues under FM's

7   policy and under a more standard policy issued to the

8   vast majority of insureds that have made these claims

9   and which policies are the subject of the decisions

10  that FM really relies on.  That earlier decision

11  which was from March is called *Selery Fulfillment,*

12  *Inc. v. Colony Insurance Company*.  *Selery* is spelled

13  S-E-L-E-R-Y.  The Westlaw cite is 2021 WL 963742.  It

14  was issued on March 15, 2021.

15          In that case, the insurer issued a policy

16  that paid for direct physical loss or damage to

17  covered property caused by or resulting from any

18  covered cause of loss.  The business interruption

19  provision said the insurer will pay for the loss of

20  business income Selery sustains due to the necessary

21  suspension of Selery's operations during the period

22  of restoration.  The suspension must be caused by

23  direct physical loss or damage to property at

24  premises which are described in the declaration.

25          Well, Judge Mazzant looked at that and he

1   says that the business interruption provision does

2   not cover Selery's claim.  This is at page 4.  The

3   provision here provides in part that there must be

4   direct physical loss or damage to property.  The

5   provisions focus on direct physical loss of or damage

6   to property strongly suggests there must be some

7   tangible, concrete issue with that property.  The

8   Fifth Circuit appears to take a similar position and

9   reasons that physical loss requires substantive

10  concrete damage.

11          And then Judge Mazzant concludes that it is

12  not surprising that district courts in the Fifth

13  Circuit who have decided similar insurance cases

14  dealing with COVID-19 have almost uniformly held that

15  the pandemic does not constitute a direct physical

16  loss or damage to the property.  That's at page 5.

17          FM then came into the *Cinemark* case and said

18  to Judge Mazzant, all you have to do is apply the

19  same analysis that you applied in *Selery* and,

20  therefore, dismiss Cinemark's complaint, which was

21  filed pursuant to the same policy at issue here.  And

22  Judge Mazzant says at page 567 of the decision, which

23  is at 500 F. Supp. 3d 565, "Factory Mutual relies on

24  this Court's recent dismissal in salary fulfillment."

25          And then he notes at 567 that *Cinemark* argues

1   the policy covers loss and damage caused by

2   communicable diseases and that Factory Mutual reads

3   the communicable disease coverage out of the policy.

4         And at 568, he says, "The Court's recent

5   ruling in *Selery* is distinguishable."

6         And he notes, the Court granted the motion to

7   dismiss because mandatory authority suggests that

8   physical loss requires a physical alteration of the

9   property.  *Selery* never alleged that COVID-19 entered

10  the property, only that the pandemic prevented *Selery*

11  from fully utilizing it.

12        And then he says, "Here, *Cinemark* alleges a

13  different harm and is governed by different contract

14  terms.  Unlike *Selery*, *Cinemark* alleges that COVID-19

15  was present and actually damaged the property by

16  changing the content of the air.  *Cinemark*'s policy

17  is much broader than the one in *Selery* and expressly

18  covers loss and damage caused by communicable

19  disease.  Both parties agree communicable disease

20  encompass COVID-19.  At this stage of the

21  proceedings, *Selery* is distinguishable.  Accordingly,

22  *Cinemark* has met its burden to defeat the motion."

23        So Judge Mazzant looked at the FM policy

24  identical to ITT's and compared and contrasted it

25  with the policy at issue in a ruling he had made

1  several months earlier.  That policy in the earlier

2  *Selery* case is indistinguishable from the policy at

3  issue in the vast majority of cases that have come up

4  with the courts in this COVID-19 situation.

5          The FM policy is broader.  It does cover the

6  communicable disease.  And at the pleading stage it's

7  completely inappropriate to come in and say, look,

8  our policy is really the same as all of the other

9  policies out there and all you need to do is apply

10  the rulings in all the other cases to this case and

11  dismiss it.  That's what FM did in *Cinemark* and Judge

12  Mazzant said, well, your policy is different, I can't

13  do that.  You need to go forward and we'll deal with

14  this later.  That's the result that needs to happen

15  here because their policy is different, it's a

16  broader policy, and ITT has alleged these types of

17  harms at its own property, let alone properties

18  within five miles and properties in their supply

19  chain.

20          I want to talk about the contamination --

21          THE COURT:  Let me press you a little bit on

22  that.

23          MR. RASKIN:  Okay.

24          THE COURT:  So changing the quality of the

25  air, so let's say that five miles -- six miles, we'll

1   say six miles away from your facility there is a

2   chlorine plant and it has a massive leak and the

3   cloud of chlorine blows down toward the ITT facility,

4   has to be evacuated.  48 hours later they're able to

5   come back, the air is restored, its back where it

6   used to be, the chlorine has passed.  Is there

7   physical loss or damage?

8          MR. RASKIN:  Well, there are lots of cases in

9   the history of these policies that have held under

10  similar factual situation that there is physical loss

11  or damage in that type of situation.  There are a lot

12  of cases.  I mean, these policies have been around

13  for more than a hundred years.  So there are cases

14  that have actually held that.

15         You know, you're talking about six miles

16  away, so that would take it outside of any kind of

17  civil authority situation.  But the presence of toxic

18  chemicals or toxic fume on property have been held in

19  lots of cases to qualify for coverage under these

20  policies because that is physical loss or damage.  I

21  mean, we didn't brief that particular issue because

22  we were dealing with this.  But there are a lot of

23  cases out there that have held that.

24         THE COURT:  All right.

25         MR. RASKIN:  I wanted to talk about the

1   contamination exclusion for a second.  We focused our

2   brief a lot on the causation requirement because we

3   think it's different.  The contamination exclusion

4   uses the older "due to" causation requirement which

5   courts have held for over a hundred years requires

6   that the excluded peril be the direct, immediate

7   cause of the loss.  And the contamination exclusion

8   could not consider communicable disease to be a

9   contaminate because the policy otherwise covers

10  communicable disease.  So it takes it out of that

11  realm.

12        And there is a difference between the due to

13  causation requirement in this contamination exclusion

14  and the virus exclusion which is the subject of many

15  decisions construing standard ISO-type policies.

16  Those policies use what is called anti-concurrent

17  causation language which basically say, look, if the

18  excluded peril is either the direct, indirect,

19  immediate, remote cause of loss or if it's only one

20  chain in a long chain of causation, it's still going

21  to be covered.  And that provision was adopted

22  basically to abrogate the application of decisions

23  concerning the due to causation requirement to these

24  types of policies.

25        And FM actually really knows this because if

1   you look at their exclusions in which the

2   contamination exclusion appears, in the policy

3   itself, document 2-1, this is at page 22, the

4   contamination exclusion is Exclusion D, and it says,

5   "Contamination in any cause due to contamination."

6          If you move up to Exclusion B, there is an

7   exclusion there for basically acts of war, hostility,

8   terrorism, uprising, nuclear wep war, things like

9   that.  And this provision says that the policy

10  excludes loss or damage in those situations, and it

11  says, "Directly or indirectly caused by or resulting

12  from any of the following."

13         So they have used an anti-concurrent

14  causation lead-in.  In this same policy when they're

15  talking about hostilities, war and terrorism, they're

16  not covering anything, whether it directly results

17  from hostilities or indirectly results from

18  hostilities.

19         So their policy has set up a difference

20  between the contamination exclusion and this

21  exclusion for war and hostilities.  And when we look

22  at policies in context, you have to kind of consider

23  those to be differences.  So the due to contamination

24  exclusion in their policy requires a contaminate to

25  be the direct cause of the loss, not an indirect

1    cause of the loss.  And when we're talking about

2    COVID-19, the virus preexists communicable disease.

3    Communicable disease is not an indirect cause of

4    loss.  It's -- the communicable disease is alleged to

5    be the direct cause of the loss.  The virus is an

6    indirect cause of the loss in this circumstance.

7         And you counter that to the provision in

8    Exclusion B where they have picked up the indirect or

9    direct caused by or resulting from causation

10   requirement to make sure that if a loss is resulting

11   from terrorism, it's not going to be covered.

12        And I did want to talk about the *Ralph Lauren*

13   decision for a second.  I mean, we think that

14   decision is wrongly decided.  And I think the easiest

15   way to look at it as being wrongly decided actually

16   is in the discussion of the contamination exclusion.

17   That's on page 4 of the decision where the court

18   starts off correctly noting that insurance policy

19   exclusions must be narrowly construed.  That's

20   universal in the case law all over the country.  But

21   then the court continues to say, "Here, the

22   contamination exclusion unambiguously excludes

23   coverage for any condition of property due to the

24   actual or suspected presence of any virus."  And then

25   it says, "which would encompass the virus that causes

 1   COVID-19."

 2          That is not a narrow application of the

 3   exclusion.  That is a broad and expansive application

 4   of the exclusion which the cause of loss was

 5   deemed -- was pled to be communicable disease.  And

 6   the court then goes broadly beyond that and says,

 7   look, I'm looking at the virus itself, even though

 8   that predates, preexists the exclusion.  So that

 9   statement in the *Ralph Lauren* decision stating the

10   rule correctly that exclusions are construed narrowly

11   but then construing this particular exclusion broadly

12   is kind of emblematic of everything that's wrong with

13   the decision because also the court does say, without

14   saying why, that apart from the communicable disease

15   provisions, the property damage and time element

16   provisions at issue limit coverage for physical loss

17   or damage.  The court doesn't say in that decision

18   why the court thinks that the communicable disease

19   provisions in the policy do not require the insured

20   to show physical loss or damage.  The court just says

21   it accepted it being true despite what the policy

22   says.

23          So unless your Honor has anything to ask, I

24   yield to Ms. Librera.

25          THE COURT:  No.  I don't think I have

1   follow-up questions.

2       Ms. Librera.

3       MS. LIBRERA:  Thank you, your Honor.  I just

4   wanted to make a few points.

5       The first point, and I think that counsel

6   just reiterated again and your Honor picked up on

7   this earlier, that the position that everything in

8   the policy requires physical loss or damage, this is

9   ITT's position, essentially means that they are

10   forfeiting their right to the communicable disease

11   and interruption by communicable disease coverages

12   because, as we've said, the triggers for those are

13   not physical loss or damage.  If ITT is right that

14   they require physical loss or damage, then ITT is out

15   of luck.  They don't recover there because there is

16   no physical loss or damage as a matter of law with

17   the coronavirus.

18       In terms of what the -- and the other point

19   to make here as well, and I think I made this in my

20   opening statement, is that the CD coverages,

21   interruption by communicable disease and communicable

22   disease response, have a $1 million supplement.  So

23   if ITT were correct that somehow this policy treated

24   the lower case communicable disease as a peril that

25   entitles it to full policy limits, there would be no

 1   need for the $1 million sub limit.  And, in fact,

 2   that renders it nugatory, which is contrary to

 3   Connecticut law.

 4          In terms of what we're talking about, what FM

 5   Global has conveyed to ITT that it is ready and

 6   willing to pay are the legitimate costs incurred and

 7   if they can establish the triggers under the

 8   communicable disease provision and interruption by

 9   communicable disease.  Those are the only places

10   under the policy where there is coverage.  Those are

11   coverage enhancements.  That's why they are in play

12   here, because the contamination exclusion makes this

13   a loss not covered by the policy.  And ITT cannot

14   show physical loss or damage due to the coronavirus.

15          And, again, I'll recommend the recent Rakoff

16   opinion which says explicitly that increased costs of

17   cleaning and buying PPE and separating out your

18   workforce, those are not -- that's not property loss

19   or damage.  What that is is reconfiguration.

20          In your Honor's opinion in the *Yale* case and

21   also in the *Mazzarelli* case, and also in the *England*

22   case by Judge Shea, each of those cases makes clear

23   why ITT's position here is incorrect.  Their argument

24   is that the actual presence of COVID-19, not even the

25   virus because, as I mentioned earlier, they try to

1   artificially separate the two.  Their argument is

2   that the actual presence, that's all they have to

3   show.  And that runs contrary to all of these cases

4   which say what is the physical loss, what -- and

5   these are the questions that your Honor was asking.

6   And I have yet to hear an answer in terms of what the

7   actual property physical loss is or physical harm.

8        The question that you had posed about a

9   noxious substance coming into the premises, I believe

10  that the *Capstone* case out of the Supreme Court of

11  Connecticut would say that that is not physical loss

12  or damage unless you can show come companion

13  alteration to the property.  And, again, analogizing

14  to the situation we have here, the virus doesn't do

15  that.

16        I'd like to touch briefly on the logic of, or

17  lack thereof, of the *Cinemark* case.  I believe

18  counsel said that he thought *Cinemark* was the only

19  case to interpret the FM policy; and that, of course,

20  is not true.  The *Ralph Lauren* case did just that.

21  The logic of the *Ralph Lauren* case is clear, lucid

22  and forecloses any of ITT's claims here.

23        The *Cinemark* case in contrast is wrongly

24  decided and in fact concludes with no basis that

25  lower case communicable disease is covered under the

1    policy.  There is nothing in the policy to say that.

2    I think what happened is the court is confused about

3    the coverage extensions that provide for a

4    communicable disease response, that's a coverage, and

5    interruption by communicable disease.  Lower case

6    communicable disease is not covered, even though ITT,

7    that is their argument, that is it is covered, it's

8    not in the policy, clearly not.

9         The last thing that I wanted to note is that

10   there are -- there have been several cases that have

11   interpreted policies similar to the one before your

12   Honor that were written by an affiliate of Factory

13   Mutual called AFM.  And in particular, several courts

14   have considered the AFM policy in connection with

15   allegations very similar to the ones that ITT is

16   making.  *Mohawk* is one of them.  That's in our

17   papers.  *MGA* is another one that's in the papers.

18        And just recently out of the Western District

19   of Washington was the *Nguyen* case which also dealt

20   explicitly with the argument that ITT is making that

21   somehow the communicable disease provisions

22   reactivate the entire policy.  And, of course, the

23   Western District of Washington rejected that.

24        Lastly, I wanted to also bring the *Salon XL*

25   case to your Honor's attention because that too deals

1   with the situation where you had an additional

2   coverage or a coverage extension.  There it was

3   communicable disease.  And the court looked at the

4   interplay between a contamination exclusion and the

5   communicable disease and said very clearly, as your

6   Honor showed here, that there's no problem with a

7   communicable disease coverage granting back that

8   which would otherwise be excluded under the

9   contamination exclusion.

10          Now, ITT's argument is not that the

11   contamination exclusion doesn't apply because there's

12   a different cause here.  What they're saying is that

13   it's communicable disease, not virus.  That's their

14   entire response to our contamination exclusion

15   argument.  They say on page 33 of their brief that

16   virus is not the immediate cause of the loss for

17   which ITT seeks coverage from FM communicable

18   diseases.

19          So, again, even if you apply a proximate

20   cause analysis here, your Honor, there's no

21   difference between the two.  The virus is the cause

22   of their loss, and there has been plenty of cases to

23   find that as well.

24          So unless your Honor has any further

25   questions, I'm prepared to rest on the papers.

 1          MR. RASKIN:  Your Honor, if I may, my

 2   colleague sent me something I had glossed over,

 3   didn't mention it, that I'd like to mention, if I

 4   could.

 5          THE COURT:  Sure.

 6          MR. RASKIN:  So on this issue of whether the

 7   policy considers communicable disease to be physical

 8   loss or damage, in the discussion of what he

 9   considers to be additional coverages in the policy,

10   it says, "This policy includes the following

11   additional coverages for insured physical loss or

12   damage."  And you go down to G in this sequence, it's

13   6G, and it's communicable disease response cause.

14          So the idea that the policy is not

15   considering communicable disease to be a -- to cause

16   a physical loss or damage to policy is belied by this

17   particular provision in the policy.  Now, the

18   discussion --

19          THE COURT:  Just the listing though doesn't

20   indicate whether it's part of the general policy or

21   an extension of the policy.  In other words, the

22   policy -- your argument is you have to have the same

23   rules apply to every provision of the policy.

24          MR. RASKIN:  Right.  This underscores the

25   fact that the policy does consider communicable

```
 1   disease to be physical loss or damage at property.
 2   That's just a --
 3          THE COURT:  There's a communicable disease
 4   provision of the policy that does provide coverage.
 5          MR. RASKIN:  Right.
 6          THE COURT:  So the fact that it's listed --
 7          MR. RASKIN:  Right.  It provides coverage
 8   when there is communicable disease at the insured's
 9   property.  The policy covers losses that the insured
10   sustained when there is physical loss or damage at
11   other property.  But this is limited to a situation
12   where there is physical loss or damage, communicable
13   disease at the insured's property.
14          My point is more of a contextual point that
15   when the policy says it includes the following
16   additional physical coverage for physical loss or
17   damage, and then it says communicable disease
18   response --
19          THE COURT:  All right.  Can you just point me
20   to the provision.  I'm getting confused.  If you
21   could point me to the provision you're quoting from,
22   that would be helpful.
23          MR. RASKIN:  It's in the additional coverages
24   provision.  I don't have the page right offhand.  I'd
25   have to go find it.
```

1          MR. OEHNINGER:  Your Honor, I don't mean to

2   speak out of turn.  But I can help, if you'd like.

3          THE COURT:  Yes, please.

4          MR. OEHNINGER:  So page 19 of the policy

5   which is ECF page 27 of 118.

6          THE COURT:  I have it.

7          MR. OEHNINGER:  Additional coverages is

8   Number 6.  This policy includes the following

9   additional coverages, quote, for insured physical

10   loss or damage, end quote.  And then it lists a

11   series of additional coverages, and scrolling down to

12   page 25, communicable disease.

13          THE COURT:  Response.

14          MR. OEHNINGER:  Response is one of them.  In

15   other words, communicable disease is a type of

16   physical loss or damage as recognized by the policy

17   and also as recognized by the table of contents.  And

18   of course we're reading all of this as a whole, not

19   plucking out selected provisions but reading it as a

20   whole in context, the structure and the text of the

21   policy, your Honor.

22          THE COURT:  Okay.  But why should I read it

23   the way you're suggesting rather than reading it as

24   in the event that communicable disease response

25   includes or results in some physical loss or damage,

1   that physical loss or damage is covered?

2       MR. RASKIN:  Well, because the -- right,

3   that's the cause-and-effect argument that was made,

4   right?  So, i MEAN, I don't know what a situation

5   would be that would fit what the argument has been

6   made on the other side; for example, there is a

7   hurricane and as a result there is communicable

8   disease at property.  I mean, that's kind of what

9   they're saying has to happen.  There has to be some

10  kind of, you know, accidental event, some kind of

11  weather event, some kind of damage to the property

12  and then physical -- then -- which is physical loss

13  or damage, and then as a result there's communicable

14  disease.  I don't think the policy is that limited.

15  It would say something to that effect if that's what

16  it was intending to do.

17      You know, the policy says, look, if there's

18  another type of physical loss or damage to property,

19  it's communicable disease and here's what we will do

20  if you have that on your property.  And in this

21  instance, it's talking about the response cause up to

22  the limit in the policy.

23      Now, the fact that there is a sub limit on

24  some kind of coverage does not mean that that's the

25  only coverage you get under this policy.  That's kind

1    of the argument that's been made.  You know, an

2    insurer knows how to do that, and FM itself has done

3    that in its policy.  This is on page -- if you look

4    at the ECF numbers, it's page 59 where it's talking

5    about the data service provider time element

6    coverage.  It talks about what it's going to provide

7    in that instance.  And then at the end of that

8    provision, it says, "Coverage provided in this

9    extension is excluded from coverage elsewhere in the

10   policy."  That's an instance where they're saying,

11   look, if this happens, this is what we're going to

12   give you and this is all we're going to give you.

13   That's it.  It's pretty clear.  It's obvious.  It

14   says this is your coverage limitation for this type

15   of coverage.  It doesn't say that in the communicable

16   disease coverages because they're just an additional

17   coverage that is available if the circumstances are

18   shown to which there is an entitlement to that

19   coverage.

20           Their argument doesn't swallow up the rest of

21   the policy.  It doesn't swallow up the sub limits,

22   particularly since ITT is claiming losses for damages

23   to third-party property for which these particular

24   coverage grants, the million dollars don't apply in

25   the first instance.  The point, though, contextually

1   is that the policy considers communicable disease to

2   be a type of physical loss or damage.  That's where

3   this comes from.

4         THE COURT:  By that logic, claims preparation

5   costs are physical loss or damage.  Coinsurance

6   deficiency and currency devaluation are physical loss

7   or damage.  Accounts receivable are physical loss or

8   damage.

9         MR. RASKIN:  Well, the way that accounts

10  receivable -- I mean, the -- I mean, claim

11  preparation costs, you wouldn't have unless you had a

12  claim.  The claim requires physical loss or damage.

13  That's an extra type of expense that is thrown in as

14  part of your --

15        THE COURT:  No.  No.  Your logic is because

16  it's included among additional coverages, it

17  necessarily constitutes physical loss or damage.  You

18  make that argument with respect to communicable

19  disease response.  That same logic suggests that

20  accounts receivable or coinsurance deficiency and

21  currency devaluation are other examples of physical

22  loss or damage.  So I think the argument fails

23  logically because of the other examples listed under

24  the --

25        MR. RASKIN:  Those are purely economic losses

```
 1    that are --
 2           THE COURT:  No.  But your theory is because
 3    they list there and the heading says "physical" --
 4    what does it say, "additional coverages for insured
 5    physical loss or damage," the policy, by your logic,
 6    defines accounts receivable, et cetera, as physical
 7    loss or damage.  The argument just doesn't work.
 8    It's not the way the policy is laid out, obviously.
 9           MR. RASKIN:  You know, I mean, that's -- our
10    case is our case.  And, I mean, if you disagree, you
11    disagree.  I mean, we'll have to deal with that.
12    But, I mean, we stand on our arguments.
13           THE COURT:  Okay.  All right.
14           MR. OEHNINGER:  Your Honor, may I respond to
15    your observation?
16           THE COURT:  Sure.
17           MR. OEHNINGER:  As to accounts receivable,
18    because in that paragraph it does specifically allude
19    to insured physical loss or damage.  So I think there
20    are instances in that listing that then ties it back
21    to physical loss or damage.
22           THE COURT:  Right.
23           MR. OEHNINGER:  Where they may not be an
24    example.  So just simply to -- for the record and to
25    respond to your illustration, your Honor,
```

1    respectfully.  Thank you.

2         THE COURT:  Sure.  My counter would be by

3    specifically saying it has to result from physical

4    loss or damage under accounts receivable but it

5    doesn't have that language under communicable disease

6    response suggests when they thought it should be tied

7    to physical loss or damage, or certainly if it was to

8    be defined as a type of physical loss or damage, they

9    knew how to say it.

10        MS. LIBRERA:  Your Honor, if I may just make

11   two short points in response to that.

12        There is, and we pointed this out in our

13   brief, there is in the definitions section an example

14   of how FM, if it chooses to call something physical

15   loss or damage that's different than physical loss or

16   damage generally, it defines it.  So in the instance

17   of physical loss or damage to electronic data,

18   programs or software -- this is on page 78 of the

19   policy -- there's a specific definition.  So if FM

20   intended to treat communicable disease any

21   differently, they would do something like what you

22   see here with physical loss or damage to electronic

23   data, programs or software.

24        The other point that I'd like to make with

25   respect to the lead-in language on the additional

1  coverages is that counsel stopped after the very

2  first sentence but there's more to this.  This says,

3  "These additional coverages are subject to the

4  applicable limit of liability, will not increase the

5  policy limit of liability and," this is the important

6  one, "are subject to the policy provisions."in other

7  words, the policy provisions are what govern here.

8         And as your Honor pointed out, in

9  communicable disease response and interruption by

10 communicable disease, there's no reference to

11 physical loss or damage.  In contrast, with every

12 other coverage that's here, for example, look at

13 cyber additional coverages, data restoration, there's

14 a reference to physical loss or damage.  Data service

15 provider property damage says "insured physical loss

16 or damage to."  And you'll find that, your Honor, in

17 every coverage where physical loss or damage is

18 required.  There's no guesswork here.  The policy is

19 very clear.

20         THE COURT:  All right.  Well, this has been

21 helpful argument.  I do have a few kind of logistical

22 questions, I'll call them.

23         First off, the complaint seeks a declaratory

24 judgment, and I'm wondering why that's necessary.  In

25 other words, if ITT wins the breach of contract

```
 1   claims, does it need a declaration that it wins the
 2   contract claims?
 3          MR. RASKIN:  Your Honor, I don't think so.
 4          THE COURT:  Yeah.  Okay.  So I was thinking
 5   it might make sense just to dismiss that without
 6   prejudice.
 7          Then, I guess, with respect to the
 8   substantive claims, I haven't decide what to do yet.
 9   But I don't want to spend the time that's going to be
10   necessary to resolve this motion unless I have the
11   very best complaint that can be brought.  So if there
12   are additions that you want to make, if there are
13   further allegations that you would like to include,
14   if there's more detail, you've heard my questions
15   about what resulted and were there any specific types
16   of physical loss or damage.  I don't want to do this
17   twice, but I want to give you your best shot.
18          So if you think that there is another
19   complaint that you can file that would be more
20   specific or would address some of the issues that
21   have come up today, I'd like to get that on file
22   before we spend the time.
23          MR. RASKIN:  We could do that.  We'll do that
24   within 30 days.
25          THE COURT:  All right.  So what I would do,
```

1  in effect, is dismiss the current complaint without

2  prejudice to filing an amended complaint within 30

3  days.  Is that acceptable?

4          MR. RASKIN:  That's acceptable.

5          THE COURT:  All right.  And then we can see

6  whether we need to rebrief the issues or whether the

7  current briefing is sufficient or addresses the

8  amended complaint.

9          I guess the final suggestion I have is

10 there's, in effect, been an offer to take up the

11 communicable disease provisions of the policy.  And

12 it would not surprise me if there is a valid, perhaps

13 sizable, claim under those provisions as FM

14 interprets them.  And I'm wondering whether that is a

15 count, in effect, that can be resolved with some

16 further communication and detail such that it would

17 not have to be brought as a separate count and

18 obviously without prejudice, because if ITT's

19 arguments prevail, there would simply be, in effect,

20 a down payment toward a larger claim.

21         MR. RASKIN:  Right, your Honor.  I know that

22 that's under discussion between the parties.  I mean,

23 I am personally not involved in that.  I do know that

24 there have been discussions, and there's been back

25 and forth kind of forensic accounting submissions.

1    So they are working on that.

2         THE COURT:  Okay.  All right.  Ms. Librera,

3    is that your understanding as well?

4         MS. LIBRERA:  It is my understanding.  And as

5    I've said, Factory Mutual is -- stands ready to

6    adjust the claim if they can meet the triggers.

7         THE COURT:  Okay.  Well, I'll leave it to

8    what happens to figure out whether that claim should

9    be included in the amended complaint.  I'll leave it

10   up to you, frankly.  But I think -- why don't we

11   proceed in that way.

12        I'll dismiss the current complaint without

13   prejudice.  I suggest that you now bring a dec

14   action, a dec claim, a second complaint and that you

15   add some details to it so there's some better

16   understanding of exactly what happened at ITT's

17   facilities.

18        All right.  Anything further or any concerns

19   about that approach?

20        MS. LIBRERA:  Not from Factory Mutual, your

21   Honor.

22        MR. RASKIN:  Not from ITT.

23        THE COURT:  All right.  Very good.  Best of

24   luck to everybody.  Take care.

25        MS. LIBRERA:  Thank you, your Honor.

1          THE COURT:  Bye-bye.

2          (Proceedings concluded, 12:04 p.m.)

3

4                C E R T I F I C A T E

5

6   RE: ITT INC. V. FACTORY MUTUAL INSURANCE COMPANY
                No. 3:21-cv-00156-SRU

7

8          I hereby certify that the within and

9   foregoing is a true and accurate transcript taken in

10   the aforementioned matter to the best of my skill and

11   ability.

12

13          /s/_Melissa J. Cianciullo_____

14       MELISSA J. CIANCIULLO, RDR, CRR, CRC
                Official Court Reporter
15           United States District Court
              915 Lafayette Boulevard
16            Bridgeport, CT 06604
                (203) 606-1794

17

18

19

20

21

22

23

24

25